LONGINO v. THOMPSON.   (No. 6132.)

(Court of Civil Appeals of Texas. San Antonio. Jan. 8, 1919. Rehearing Denied Feb. 26, 1919.)

1. SALES ⬅441(4)—DELIVERY OF GOODS NOT ORDERED—ACTIONS—EVIDENCE—DAMAGES.

In an action for damages from failure to furnish tomato seed of the variety ordered, evidence as to the difference between the crop raised on part of the land from seed of the kind ordered, and on the remainder, while showing damage, held insufficient to furnish a basis for estimating it.

2. SALES ⬅267 — DELIVERY OF GOODS NOT ORDERED—NONWARRANTY NOTICE.

In an action for damages for failing to furnish seed of the variety ordered, a nonwarranty clause on the dealer's billhead, sent with seeds ordered by telephone, did not affect the contract, unless it came to the purchaser's knowledge prior to planting the seed.

Appeal from District Court, Nueces County; W. B. Hopkins, Judge.

Action by R. R. Longino against A. A. Thompson. Judgment for defendant on a peremptory instruction, and plaintiff appeals. Affirmed.

John De Berry Wheeler, of Aransas Pass, for appellant.

G. R. Scott and Boone & Pope, all of Corpus Christi, for appellee.

MOURSUND, J. This is a suit by appellant against appellee operating under the name of Eastern Seed Company, for damages arising out of the alleged failure of defendant to furnish plaintiff the variety of tomato seed which defendant agreed to sell plaintiff. Plaintiff alleged that on or about February 1, 1913, defendant offered to sell plaintiff certain tomato seed, representing them to be of a variety known as "June Pink"; that defendant represented the seed to be pure June Pink seed, and further that he had visited the place where the seed grew, and that he handled them at a greater cost to himself than other seed, because he knew they were June Pink tomato seed of a superior quality; that, relying on such representations plaintiff purchased certain quantities of the seed on or about the 5th

and 12th days of February, 1913, and the seed delivered were accompanied by written or printed representations to the effect that said seed were June Pink tomato seed. Plaintiff alleged:

"That he gave due and proper cultivation to the land planted to these seed, and after it was too late to replant said field discovered that they were not of the variety known as June Pink, and did not grow or mature as said variety, and alleged that by reason of the premises he had been damaged in the sum of $2,485. This damage was based upon the allegation that, had the seed been June Pink tomato seed, as he contracted for and as represented to be, the land planted in tomato seed by him would have produced about 5,850 crates, of the market value of $3,545, but that the field actually produced about 950 crates, the market value of which was about $515, the difference between the value of said two crops being $3,030; that, had said seed been of the June Pink variety, he would necessarily have purchased about 4,700 crates more than he did purchase, and the price of said crates, together with the expense incident to packing same, would have amounted to about $545, and he would have been damaged in the sum of $2,485.

"Appellee denied that he offered to sell appellant tomato seed, representing them to be June Pink, but that about the time alleged in the petition appellant ordered June Pink tomato seed from appellee by telephone or by letter, requesting appellee to ship said seed to him at Ingleside, with bill therefor, and he would pay for same upon delivery. At said time appellant well knew and understood that appellee had not raised the seed; that he was a retail dealer, who purchased his seed in the open market, and had no means of knowing and did not know the variety, quality, and productiveness of the seed, only sold the seed purchased by him, did not warrant or guarantee the variety, quality, description, 'or productiveness of said seed, and did not warrant or guarantee that they were June Pink tomato seed, and denied that he represented that the seed were June Pink tomato seed, and that he sold said seed from seed carried by him in bulk, which had been purchased by him as June Pink tomato seed, all of which was known to appellant.

"Appellee further alleged that one of his regular billheads accompanied each shipment made by him to appellant, and that appellant paid the amount of each bill by remittance to him after receiving the seed, and alleged several previous transactions between them in which this plan was carried out, denied that there were any printed representations of warranty or guaranty accompanying the shipments, and denied that appellant relied upon any alleged representations made by him. * * *

"In the thirteenth paragraph of his answer appellee alleged that previous to the sale of the particular seeds in controversy he had at different times sold other seeds to appellant, and appellant at said times understood that appellee did not raise said seed; that he purchased said seed in the market; that he was not in a position to know, and did not know, the variety of seed carried in stock and sold by him, other than as the same were purchased by him; that he gave no warranty or made no representations, express or implied, as to description, quality, productiveness, or any other character of the seed carried in stock by him, and that he was not and would not be in any way responsible for the crop resulting from the planting of such seed; and that with this knowledge and understanding appellant purchased said seed, and they were sold and delivered to him, and estoppel was pleaded.

"Appellee alleged that in his correspondence with appellant and all other growers he used letter heads upon which there was printed in plain legible type the following, known as the nonwarranty clause: 'Eastern Seed Company gives no warranty, express or implied, as to description, quality, productiveness, or any other character of any seed it sends out, and will be in no way responsible for the crop. If the purchaser does not accept the seed on these terms, they are at once to be returned.'

"It was also alleged that in the course of dealings between the parties previous to and at the time of the shipments in controversy, with each shipment of seed made by appellee to appellant, appellee made out a bill on one of his regular billheads, on which said clause was printed in plain and legible type, and that such bill accompanied each shipment, and the seed were received and accepted by appellant with full knowledge of the contents of said stipulations, and all of said facts, and said seeds were paid for by him in accordance with the terms of shipment and the stipulations of each of said bills. Said bills were returned to him to be receipted, and were in possession of appellant, who was notified to produce same at the trial of the cause, or secondary evidence would be offered.

"It was pleaded that the nonwarranty was a part of the contract of sale, and the seeds were accepted with that understanding by appellant, paid for by him with that understanding, and that by reason of the premises he was estopped to deny," etc.

In making the foregoing statement we have availed ourselves to a large extent of the statement made in appellee's brief. Pursuant to a peremptory instruction, a verdict was returned in favor of defendant, and judgment entered in accordance therewith.

Appellee contends that the ruling of the court in instructing a verdict in his favor must be sustained, even though it were conceded that there was an implied warranty. This contention is based on the theory that the evidence concerning damages is insufficient to support a verdict against him. We find that the only evidence relied upon to show the quantity of June Pink tomatoes appellant would have raised, had the proper seed been furnished him, is appellant's conclusion, which is based upon a comparison of the crop produced from two acres of June Pink tomatoes planted and cultivated by him with that produced on the seven acres planted with the seed bought from appellee. It appears, however, that the plants of the

June Pink variety on one acre were derived from seed planted in January, transplanted just before the freeze, and maturing long before any other tomatoes planted by him. The testimony shows that early planting, when the plants are not injured by a freeze, is conducive to a more prolific production of tomatoes. The other acre of June Pink tomatoes was obtained by transplanting from a neighbor's field plants obtained from seed planted at the same time, or very nearly the same time, as the seed obtained by appellant from appellee. Appellee testified that transplanting at the time such plants were placed in his field had the effect of retarding growth for a week or more. His testimony was sufficient to show that a comparison of the amount produced by this acre would furnish a fair test as to what the seven acres would have produced, had the proper seed been used, but unfortunately he failed to gather the crop therefrom separately from that of the other acre of June Pink tomatoes, and frankly admitted that he could not tell "just how the two acres of June Pink compared." He said the "young tomatoes were awful fine," perhaps referring to both quality and quantity, but did not make any estimate of the number of crates produced by such second acre. In view of the fact that the production of the first acre of June Pink tomatoes is no criterion as to what would have been produced from seven acres, if planted in June Pink about February 6, 1913, it is evident that his comparison of the total quantity produced from the two acres planted in June Pink tomatoes with the quantity produced from the seven acres furnished no sufficiently definite guide to the jury—in fact, left the jury to make a guess. It was also shown that about 100 June Pink plants remained on the seven acres after the freeze, and produced much more prolifically than the plants from the seed furnished by appellee, but said hundred plants were much older, and a comparison was not shown to furnish any fair criterion of what would have been produced by June Pink plants from seed planted on February 6, 1913.

We also find the testimony very uncertain on the question of value. The market opened at Ingleside, where appellant's crop was situated, about May 10th, and was active until June 15th, but there was a market throughout June. Appellant marketed his first crate about May 12th. The first car of tomatoes marketed at Ingleside brought $1.50 per crate; for the next week or 10 days the price was $1.25 per crate; then for a few days, $1 per crate; then the next period of probably 10 days tomatoes brought 75 cents per crate; and then the active market closed about the 15th of June, when the main buyers left there. His testimony with regard to marketing his crop is not clear and specific. He said he sold one crate for $1.50 and 20 or 30 crates of the Thompson tomatoes on the $1.25 market; that he had only one acre bearing on the $1.25 market; the bulk of his first acre of June Pink came in on the $1.25 market; the bulk of the young June Pink on the $1 market; and the bulk of the Thompson tomatoes on the 75 cent market. Nothing is said by him concerning any sales for less than 75 cents, though others testify that after the active market closed tomatoes steadily declined. If he sold none for less than 75 cents per crate, we must infer that over half of the Thompson tomatoes were sold for 75 cents per crate, and the remainder for $1 a crate, and that over half of the young June Pink crop sold for $1 a crate and the remainder for 75 cents. This would authorize a finding that if the seven acres had been planted with June Pink tomato seed, and only the same quantity produced as was produced from the Thompson tomatoes, appellant would have received more money for them than he received for the Thompson tomatoes because they would have matured the bulk of their crop earlier, but no basis is furnished for determining how much more he would have received. If he meant that more than half of the young June Pink crop matured in time for the $1 market, and that none of the Thompson tomatoes matured for such market, but over half were sold at 75 cents per crate, and the remainder after the market declined below that price, he failed to so state, and in fact there is an admission by him that he sold 20 or 30 crates of the Thompson tomatoes on the $1.25 market, and of course considerably more must have been sold on the $1 market.

He testified, further, that he got through marketing the first acre about June 10th, and began marketing on the second acre of June Pink on the 2d or 3d of June, and thought he had a few of them for marketing all through June; that he believed he picked seven crates of the Thompson tomatoes the last days of May or the first days of June, and carried them to the depot, but it was nearly a week before the buyer told the inspector to put them in. This testimony indicates that the second acre of June Pink and the Thompson tomatoes commenced producing for the market at about the same time. He testified he gathered from the two acres of June Pink "1,600 and some crates," which he sold "for $1,025, or approximately that," and from the seven acres "less than 600 crates" which he sold for "less than $500, something in the neighborhood of that, anyhow." Taking these rather indefinite estimates as correct, he received 64 and a fraction cents per crate for the June Pink tomatoes, and 83 and a fraction cents for the Thompson tomatoes.

[1] It is evident that no such testimony is

furnished by appellant as would form the basis for an estimate of what proportion of the crop produced on the seven acres would have brought a higher price, because of early maturing and marketing, had such land been planted in June Pink seed instead of Thompson seed. Appellant testified that he kept a record of his daily gatherings and sales, but it was not introduced in evidence, nor did he claim to refresh his memory by reference thereto. The record discloses a case in which the testimony is such that it supports a finding that appellant was damaged by reason of being furnished the wrong seed, but fails to furnish any basis for estimating such damages, and any sum on which the jury might have agreed would have been the result of pure speculation, surmise, and conjecture. The court, therefore, did not err in instructing the jury to return a verdict for appellee.

[2] The instructed verdict cannot be sustained on the theory that the evidence conclusively shows that the sales of seed were made upon an implied agreement that no warranty should result therefrom. The contracts did not consist of a mail order, and the shipment of the seed accompanied by a notice of nonwarranty, and request to return the seed if unwilling to purchase on such terms, but were made over the telephone, and to say the least the notice on the bills could not affect such contract, unless it came to the notice of appellant prior to the planting of the seed. Appellant denied having read the notice on any of the bills. In fact, it may well be doubted whether any of the bills were admissible in evidence, in the absence of direct or circumstantial evidence tending to show that appellant read the notice printed thereon. The authorities on this question are collated in 37 L. R. A. (N. S.) 82, and L. R. A. 1916C, 1013. In view of the affirmance of the judgment on a ground not affected by such evidence, it becomes unnecessary to pass on its admissibility.

Judgment affirmed.