[Civ. No. 19292.   Second Dist., Div. Two.   Mar. 2, 1954.]

INDIA PAINT AND LACQUER COMPANY (a Corporation), Appellant, v. UNITED STEEL PRODUCTS CORPORATION (a Corporation), Respondent.

598

Chapman, Frazer & Lindley and John S. Frazer for Appellant.

Robert H. Dunlap and Samuel Reisman for Respondent.

FOX, J.—India Paint and Lacquer Company, hereinafter referred to as "India," sued United Steel Products Corporation, hereinafter referred to as "United," to recover the value of certain paint or baking enamel sold and delivered to United. By its amended cross-complaint United sought damages from India for its losses (1) due to sticky paint, and (2) for losses occasioned by flash fires in its baking oven, due to allegedly defective paint sold by India to it. United based its right to recover upon a breach of both implied and express warranties.[1]

After a trial of more than five weeks[2] the court awarded United damages in excess of $104,000, and determined that United owed India more than $20,000 for paint sold and delivered. The court thereupon rendered judgment in favor of United in the net amount of $84,000. It is from this judgment that India appeals.

In 1940 United was engaged in the manufacture of aluminum and steel Venetian blind stripping. Its plant was located on Alameda Street, in Los Angeles. The material manufactured by United consisted of metal strips upon which enamel was applied on both sides through a baking process, and thereafter the stripping was rolled, layer upon layer, into coils. This stripping is known generally as either "coiled Venetian blind stock" or "slats" and is customarily coiled without any other inner layer or wrapper between the successive layers of enameled stripping, so that the surfaces of the successive coils come directly in contact with each other.

In the latter part of 1940 United employed Lloyd Pollett, placing him in charge of its painting and baking department. Prior to that time United did not purchase any of its paint or baking enamel from India, but purchased its requirements from other paint concerns. United was satisfied with the paint products it was then buying. At that time Lloyd's brother, Chester, was employed as a paint salesman by India, and their uncle, Burton Pennington, was the president and principal owner of India. Shortly after Lloyd was employed by United several conversations were had between him, his brother Chester and Mr. Pennington, looking toward securing United's paint business for India. Conferences occurred

---

[1]The counts based on negligence were withdrawn at the trial.

[2]The Reporter's Transcript covers 3,358 pages; 210 exhibits were received in evidence, and the briefs total 366 pages.

wherein India solicited the paint business of United, offering to sell to United paint or enamel that would be absolutely suitable and proper for use by United on its Venetian blind stripping material in the manufacturing process employed by United. It was stated to Mr. Bayer, president of United, by both Pennington and Chester Pollett on behalf of India, that "Our paint is guaranteed. We know your requirements. We know your oven, and we know what type of paint to give you for your business." Shortly thereafter United started buying enamel from India. From some time in 1941 until July, 1949, with very few exceptions, United purchased all of its paint requirements for baking enamel from India and became India's largest customer. However, shortly after the start of the war in December, 1941, because of the lack of available metal, United ceased manufacturing Venetian blind stock and consequently stopped buying paint. In 1945, United resumed its Venetian blind manufacturing business and once more started buying enamel from India. About this time India reiterated the representations made at the inception of the business relationship, that its product was guaranteed to produce satisfactory results. About this time United moved its place of business to Avalon Boulevard, in Los Angeles. United also maintained a plant at Jeffersonville, Indiana, but that plant did not use India's products.

In January, 1949, United encountered increasingly strong competition in the sale of its products, and had been offered paint by an eastern concern at a lower price. United advised India of this situation. At this time India's vice president, Ray Sahm, told United that he did not believe India could lower the price of the paint it was then furnishing United but India might be able to reduce the price by reformulating the paint. United admonished India to be sure that the paint was as good as they were then furnishing. To this Mr. Sahm replied: "You don't have to worry about this. Our paint is always good. We will always give you a guarantee, and you don't have to worry about anything." A short time thereafter Chester Pollett brought to United's plant a small batch of paint which was run through United's equipment at his request. Chester took a coil of the stripping back to India for testing. Later India advised United that the new batch was all right, and the price would be $3.75 a gallon instead of the former price of $4.30 a gallon.

During the entire period that United purchased paint or enamel from India, United had no laboratory and employed

no chemists.   India, however, was familiar with United's equipment and had access to it.   United always purchased from India by ordering the paint by colors and never ordered any paint or enamel from India by designation of number or formula.

The first deliveries of paint at the new price were on February 4, 1949.   United immediately commenced the use of the new paint in its usual operations and soon began shipping out its completed product.   About the middle of March, 1949, United began to receive complaints from its customers to the effect that the stripping stuck together and the paint peeled from the surface of the slats as the coils were unwound.   Samples showing the sticky or "tacky" condition of the stripping were returned to United by its complaining customers.   These samples were turned over to India with the demand that this condition be corrected.   Thereafter India's representatives advised United that they were incorporating a material into the paint that would harden the surface so that there would be no more trouble with sticking.   Based upon these assurances, United continued to purchase paint from India.

Complaints about the sticky condition of the stripping continued.   As each complaint was received United immediately communicated with India and requested that India do something to remedy the situation.   On each occasion United was informed that India had put some further substance into the paint that would overcome the sticking.   During the period from about the middle of March, 1949, to the first of July India supplied a number of different formulations of the paint or enamel to United, each of which it assured United would eliminate the sticking problem.   United, however, was not advised as to the ingredients that went into any of the paint.   After the stripping material was manufactured with the use of the paint furnished by India no immediate difficulty appeared and when the slats were used promptly no defect was encountered.   However, if a painted coil was allowed to remain unused for a period of weeks a delayed-action defect appeared in that the painted surfaces of the coils began to stick together.   This difficulty applied to both the steel and the aluminum stripping.

Based upon India's assertions as to the quality of its enamel. United guaranteed its product to its customers, and therefore United found it necessary to accept the return of the sticky stripping, and issued full credit therefor.   Although

United attempted to salvage the material in order to mitigate damages, it was unable to do so. By reason of the foregoing, United not only sustained loss on the material but other losses for freight for the return of the defective stripping, costs of investigation, and inspection trips. United showed it suffered substantial injury to its good will.

India's effort to solve the stickiness problem continued until about July, 1949. In the face of United's mounting dissatisfaction, Mr. Sahm informed United not to worry, "we are taking care of everything. Everything will be O.K." However, the promised relief did not materialize. Thereupon the business relationship ceased. United then began to purchase its paint from another concern and thereafter had no further problems with sticky stripping.

On August 5, 1949, United States Testing Corporation was engaged by United to compare the performance of India's paint with that of two of its competitors. United's equipment was stopped, cleaned, and then the regular manufacturing process was restarted under the supervision of Mr. Brennan of the testing concern. Six coils of aluminum stripping were started through United's equipment. New barrels of paint, supplied by India, Fuller, and Sherwin-Williams, were used in conducting the tests. The six strips were processed at the same time, with each brand of paint being applied to two of the strips. Two test runs were made. Samples of the test runs were taken by the testing concern, sealed, and remained in the possession of the testing corporation until the trial, when they were actually opened in court during the testimony of Mr. Brennan. When examined in court the unwinding of the coils to which India's paint had been applied was accompanied by a ripping or tearing sound and on inspection the stripping to which India's paint had been applied was found to be sticky or "tacky," with damaged surfaces plainly visible. On the other hand, when the samples painted with the other two brands of paint were uncoiled and inspected no stickiness was found and the stripping was in excellent condition.

For approximately three weeks in the latter part of May and the early part of June, 1949, United encountered a series of approximately 150 flash fires in its ovens. On these occasions the equipment would be in operation and suddenly the stripping in the larger oven would catch fire. After two of these flash fires had occurred India was advised of them and questioned as to whether there was anything wrong with

the baking enamel. Mr. Canet, India's chemist, advised that the enamel was all right and suggested that perhaps United's oven had a defect which was causing the fires. Thereupon United dismantled and reassembled the oven on four different occasions. On the first of these, two loose connections were found, and were tightened. However, the flash fires continued intermittently during the remainder of this period. Finally, toward the end of the three-week period in question, a representative of India disclosed to United that a check of the materials which were incorporated in the paint revealed that one of the ingredients had a flash point of 31 degrees Fahrenheit. United thereupon returned to India all the baking enamel it had on hand and the same was accepted by India and full credit issued therefor. India then reformulated its paint and the flash fires ceased.

India produced testimony by experts designed to counteract United's contention that a latent defect in its paint produced a "delayed-action" stickiness and caused the flash fires. The opinion of many of these experts was that both flash fires and stickiness could be caused by an improperly vented baking oven, resulting in saturation by solvent vapors emanating from substances used in the cleaning process. India introduced evidence to establish that lack of constant oven temperatures could cause sticking, as would lack of uniformity of thickness of the stripping, or a change in its rate of speed. It presented evidence tending to show that United's ovens were not properly vented and did not have equipment which would enable it to properly gauge and maintain constant conditions. Highly technical data was furnished by India's experts which, if believed by the court, would have absolved India of responsibility for the flash fires and would have attributed the sticky stripping to United's deficient operating methods.

Harold R. Harlan, one of United's experts, directly attacked India's formulas. He testified that all of the formulas in question were liable to stick when used in United's process. He asserted that because of alkyd resins in the formulas, unpolymerized materials would be left in the paint film, which superficially appeared well baked, and the subsequent migration of these materials would cause a delayed sticky condition. Harlan also imputed United's difficulty to the presence of an excessive amount of amine resins in India's formulas. Wayne D. Hawkins, another expert, regarded the lack of a "slick compound" in India's formulas as a cause

of stickiness. India's experts upheld the use of slick and amine resins in the over-all formulas.

At the beginning of the business relationship between the parties in 1940, when India delivered paint or baking enamel to United it was accompanied by a pink document called an invoice. It described the product and the quantity thereof but contained no prices or terms of sale. A day or two after the delivery of the purchased material a formal white. statement was received, also denominated an invoice. This white document carried the same information as the pink and in addition showed the unit price and the total charges for each item and the aggregate amount of the purchase. At the time of the resumption of business relations between India and United, India's method of shipping to and billing United was as follows: a set of documents captioned "invoice" was prepared in quadruplicate, and labeled respectively "Office Copy," "Shipping Copy," "Customer's Copy" and "Salesman's Copy." Two of the so-called "invoices," the "Customer's Copy" and the "Shipping Copy," accompanied the delivery of material to United. In fine print, the smallest print used on the paper, there appears at the bottom of these documents, below the last of the horizontal lines, the following language: "Seller neither assumes nor authorizes any person to assume for it any other liability in connection with the sale or use of the materials sold hereunder, and there are no oral agreements or warranties collateral to or affecting this sale. No claim of any kind shall be greater in amount than the purchase price of the materials sold hereunder for which any damages are claimed." In addition, the document contains a description of the amount of the particular item transmitted to the customer, but not the price. The person receiving the goods would sign the "Shipping Copy" and retain the "Customer's Copy." A day or two later, India would mail to United a typewritten document different in form and size from the ones previously described, and bearing an elephant-head insigne. This document, also labeled "invoice," contained all the details of the sales transaction, including an itemization of price, which was absent on the other document. Also absent from this document was the language of disclaimer of warranty and limitation of liability, or any similar language. There was testimony that at no time had India called United's attention to the language of disclaimer, nor were United's agents aware of this disclaimer statement until shortly before the trial. In fact, India did

not raise the disclaimer issue until approximately six days before the case was originally set for trial.

India's first contention is that the trial court erred in finding it had made express oral warranties that its paint or baking enamel would be absolutely suitable for use by United. This proposition is untenable. In treating a similar contention in the case of *Stott v. Johnston*, 36 Cal.2d 864, 869-870 [229 P.2d 348, 28 A.L.R.2d 580], the court stated: " 'Any affirmation of fact 'or *any promise* by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon . . .' Under this section [Civ. Code, § 1732] no particular words are necessary to create a warranty, and whether the word 'warrant' was used in the parties' dealings is immaterial (citations) . . ." The holding of *Stott v. Johnston* is singularly apposite to the circumstances adduced in the instant case. The evidence shows that the oral warranties made in 1940 were renewed in 1945 when business relations between United and India recommenced. These were in the form of clear-cut statements that India "would absolutely guarantee" satisfactory performance. As late as January, 1949, immediately prior to United's difficulties with India's product, Mr. Sahm once again expressed plaintiff's policy in unequivocal language: that India would always guarantee the products it sold United. Mr. Bayer testified he wished such assurance with respect to the cheaper paint India was about to supply in order not to lose United's account to eastern competitors. The testimony fully supports the finding that the sales were consummated on the basis of express oral warranties.

In view of our conclusion that India's liability may be sustained by reason of its breach of an express warranty, it becomes unnecessary to discuss United's further claim that India's liability might likewise be predicated upon the breach of an implied warranty (*Stott v. Johnston, supra*, p. 870.)

India next attacks the court's finding that the statements on the documents accompanying the delivery of paint to United containing language purporting to disclaim the existence of warranties and limiting India's liability to the amount of the purchase price, are "meaningless and of no legal consequence." Correlated with this argument is India's objection that the court erroneously admitted evidence of alleged

antecedent oral warranties which were in conflict with the written disclaimers previously alluded to. Both of these contentions are without substance.

For India's arguments to prevail, it would be necessary to establish that the shipping documents it relied upon constituted a complete, integrated contract between the parties, under which circumstances the familiar rule that parol evidence is not admissible for the purpose of varying or contradicting the express terms and conditions of a written contract would apply. "But in order for this rule to have any application, the writing must be one which, by legal construction, shows upon its face that it was intended to express the whole contract between the parties. (Citations.) It does not apply to a mere memorandum like the one we are now considering, and which does not of itself import any contract. (Citation.)" (*Kreuzberger* v. *Wingfield,* 96 Cal. 251, 255 [31 P. 109].) In the Kreuzberger case, the court had before it a writing relating to the construction of a sidewalk which purported to be of a contractual nature. The court held that the writing was simply a memorandum and stated: "It contains no contract stipulations, and shows upon its face that it was only intended as an informal memorandum, and it must therefore be considered in connection with the oral negotiations which preceded it." (*Ibid,* 255-256.) The Kreuzberger case holds to the established principle that the parol evidence rule applies only when the writing to be protected is a complete contract and not a mere memorandum of a contract. In *Mesibov, Glinert & Levy* v. *Cohen Bros. Mfg. Co.,* 245 N.Y. 305 [157 N.E. 148, 150], Justice Cardozo expressed the same rule as follows: "We do not overlook the difference in this connection between a contract in writing, and a note or memorandum of a contract. The one is subject to the parol evidence rule; the other may be shown by parol to be inaccurate or incomplete. (Citations.)"

The handwritten documents accompanying India's shipments of merchandise, which are labeled "shipping copy invoices" but which are actually, as found by the trial court, bills of parcels, clearly do not represent anything more than receipts attesting to the delivery of merchandise. Apart from the finely-printed language of disclaimer and limitation of liability on the very bottom, they contain only data as to the date of shipment and the quantity of a particular item delivered to the purchaser. Their informality, incompleteness, and lack of contractual character show on the face of

the documents. Professor Corbin, in discussing the legal effect of placing on a document express, written statements that there have been no extrinsic warranties, remarks: "The fact that a written document contains one of these express provisions does not prove that the document was ever assented to *or even became operative as a contract*. Neither does it exclude evidence that the document was not in fact assented to and therefore never became operative." (Italics added.) (Corbin, *Parol Evidence Rule,* 53 Yale L.J. 603, 619.) Similarly, the Massachusetts court made the following pertinent commentary with reference to documents sent to a purchaser upon delivery of goods: "The bills of parcels which were sent from time to time with the merchandise were susceptible of explanation by parol evidence, . . . They were sent only as memoranda of the amount and value of the merchandise transmitted. (Citation.)" (*Schenck* v. *Saunders,* 13 Gray (79 Mass.) 37, 41-42.) It is patent that the court below, in admitting evidence of the oral warranties, correctly refused to accord to the cursory memorials of a delivery transaction the dignity of constituting the final repository of a written agreement between the parties. Likewise, it properly refused to give effect to the disclaimer and liability provisions therein in the absence of its being established that they were known by, or brought to the attention of, United or its agents. This is particularly true in view of the fact that the actual invoice, a typewritten document of completely different size, design and format than the shipping document, which was customarily sent out a day or two after the deliveries, contained the detailed terms of sale but no language of disclaimer or limitation of liability.

Furthermore, it is pertinent to observe that even if the shipping document is regarded as an invoice, as India contends, this would not *ipso facto* transform it into the contract between the parties, unless so intended by them or unless such effect is given to it by the application or operation of some principle of contract law. ██ The prevailing rule is that an invoice, standing alone, is not a contract (*Campion* v. *Downey,* 77 Cal.App. 125, 130 [245 P. 1098] ; *Tanenbaum Textile Co.* v. *Schlanger,* 287 N.Y. 400 [40 N.E.2d 225, 226] ; *Hoffman-La Roche, Inc.* v. *Weissbard,* 19 N.J.Super. 210 [88 A.2d 238, 245] ; 48 C.J.S. 765) ; and a buyer is ordinarily not bound by statements thereon which are not a part of the original agreement. (*Kocher* v. *Cartman Tire Exch.,* 108

Cal.App. 619, 620 [291 P. 856]; *Tanenbaum Textile Co.* v. *Schlanger, supra*; *Diepeveen* v. *Larry Vogt, Inc.*, 27 N.J. Super. 254 [99 A.2d 329, 330]; *Reliance Varnish Co.* v. *Mullins Lbr. Co.*, 213 S.C. 84 [48 S.E.2d 653, 658].) In *Tanenbaum Textile Co.* v. *Schlanger, supra,* the question presented was whether there was an agreement to arbitrate disputes arising out of the sale of goods, such arbitration agreements being required by statute to be in writing. There had been 20 separate sales of goods between the parties, the orders being placed by telephone. Immediately after each delivery of goods, invoices were mailed to the buyer, on each of which there was stamped in red ink: "All controversies arising from the sale of these goods are to be settled by arbitration." The buyer retained all of these invoices. The seller insisted that there arose thereby a contract to arbitrate. In rejecting this argument, the court admitted "that acceptance of a document which plainly purports to be a contract gives rise to an implication of assent to its terms despite ignorance of the content thereof. (Citations.) But that is not this case. An invoice, as such, is no contract. An invoice is a mere detailed statement of the nature, quantity, and the cost or price of the things invoiced. (Citations.)" The court further held that the retention of the goods by the buyer did not of itself operate as an assent to the conditions on the invoice.

■ Where, as in the case at bar, sales transactions are entered into on the basis of anterior warranties, it is universally held that an attempt to disclaim the binding effect of such warranties upon or after delivery of the goods, by means of language on an invoice, receipt or similar notice, is ineffectual unless the buyer assents or he is charged with knowledge of nonwarranty as to the transactions. (*Keller* v. *Flynn*, 346 Ill.App. 499 [105 N.E.2d 532, 535]; *Diepeveen* v. *Larry Vogt, Inc., supra*; *Manglesdorf Seed Co.* v. *Busby*, 118 Okla. 255 [247 P. 410, 411]; *Moorhead* v. *Minneapolis Seed Co.*, 139 Minn. 117 [165 N.W. 484, 485, Ann.Cas. 1918E 481, L.R.A. 1918C 391]; *Ward* v. *Valker*, 44 N.D. 598 [176 N.W. 129, 131]; *Longino* v. *Thompson*, (Tex.Civ.App.) 209 S.W. 202, 205; *Ingraham* v. *Associated Oil Co.*, 166 Wash. 305 [6 P.2d 645]; *Edgar* v. *Joseph Breck & Sons Corp.*, 172 Mass. 581 [52 N.E. 1083]; *Reliance Varnish Co.* v. *Mullins Lbr. Co.*, 213 S.C. 84 [48 S.E.2d 653, 659]; *Gray* v. *Gurney Seed & Nursery Co.*, 62 S.D. 97 [252 N.W. 3, 6]; *Davis* v. *Ferguson Seed Farms*, (Tex.Civ.App.) 255 S.W. 655, 662.) In each of the last cited cases the courts were confronted

with the question of whether the existence of an alleged warranty was extinguished by nonwarranty statements or disclaimers of warranty printed on letters, invoices, or other literature sent with or after the shipment of goods. In each case it was held that where goods are sold subject to a warranty, the purchaser is entitled to rely upon this warranty despite the printed statements on the seller's invoices, at least until he has actual knowledge of the disclaimer, or because of the facts and circumstances surrounding the transaction he should be charged with such knowledge. The following language from *Ward* v. *Valker*, 44 N.D. 598 [176 N.W. 129, 131], epitomizes the prevailing view: "If the circumstances anterior to the invoices indicated the existence of a warranty, we cannot say the printed statement (of disclaimer) on the invoice operated to extinguish it as a matter of law." The rule is also succinctly expressed in *Gray* v. *Gurney Seed & Nursery Co.*, *supra*, that "when the seller expressly warrants the goods, the purchaser is entitled to rely upon this warranty at least until he has actual knowledge of the disclaimer or because of the facts and circumstances surrounding the transaction should be charged with such knowledge." The evidence fully demonstrates that the sales were made pursuant to express warranties and that United had no knowledge of the disclaimer and limitation statements.

The application of these principles is illustrated in two cases from our own courts, *Campion* v. *Downey*, 77 Cal.App. 125 [245 P. 1098], and *Kocher* v. *Cartman Tire Exch.*, 108 Cal.App. 619 [291 P. 856], in both of which a hearing was denied by the Supreme Court. In the Campion case, defendant gave evidence regarding oral agreements in connection with sales transactions, which was objected to on the ground that the contract was embodied in the invoice sent after the sale and that such written instruments could not be varied by parol. In rejecting the contention that the invoice was a contract and in upholding the admissibility of the oral evidence, the court stated (p. 130): "There is another reason why the evidence was properly admitted. The letter . . . inclosing the invoice constituted the written contract giving to appellant's contention the broadest interpretation the facts will warrant. However, that letter and invoice constituted merely what the books term a 'bill of parcels,' and were not of such dignity as necessarily to indicate that all previous negotiations were merged in them.

(Citation.) All of the courts seem to have made a distinction which is patent between a formal bill of sale and a bill of parcels when considering the rule (citations).''

In the Kocher case, *supra*, an examination of the briefs on appeal indicates that plaintiff-assignee sued on a claim arising out of two sales of tire tubes. The trial court found in favor of defendant's plea of breach of warranty. The transaction commenced with the signing of orders by defendant and a salesman, which did not contain the full particulars of the transaction. The order slip bore the following language: ''Not Guaranteed. Seconds. Confirmation.'' Thereafter the tubes were delivered with invoices on which were written: ''Duplicate Invoice. Second Tubes Not Guaranteed. Not Subject to Return or Adjustments.'' It was contended on appeal that the court's finding that a warranty was made and breached rested on improperly admitted parol evidence. The court (p. 620) replied: ''He (plaintiff) calls to our attention written orders signed by the defendants in which the defendants ordered so many tubes of such and such sizes. Those orders were signed by the defendants and by a salesman of the seller, but the orders do not purport to be contracts. No word indicating a sale is used. They name no price nor prices nor the total amount of the goods purchased. They specify red tubes and sizes. Nothing more . . . Such orders were not contracts, they were but a portion of the evidence of the actual contracts. (Citations.) . . . After the orders were placed the seller transmitted certain invoices on which it attempted to place certain additional covenants into the contract. Such additions were mere self-serving declarations on the part of the seller and were not binding on the purchasers. (Citation.) None of the additions or indorsements mentioned had the effect of precluding the defendants from introducing their defense and, it having been introduced, the most that can be said is that there is a conflict in the evidence as to the warranty.''

The rationale of the Campion and Kocher cases, as well as the doctrines announced in the cases previously adverted to, apply with equal force to the invoices in the case at bar, which India refers to as the ''basic written document.'' Certainly it could not be said as a matter of law that United should have been aware of the finely-printed statements as to disclaimer and limitation of liability. Since the provisions are so located as to easily escape attention, and since there was testimony by United's officers and agents that they had

never been cognizant of the disclaimer nor had it been called to their attention, there was substantial support for the court's finding that said language was ineffectual and not binding on United. This being so, we may not disturb these findings on appeal.

The group of authorities relied upon by India in support of its arguments that United was bound by the statements of disclaimer and limitation of liability and that it was of no consequence whether United's officers had read the statements, are clearly distinguishable. One category includes such cases as *Taussig* v. *Bode & Haslett,* 134 Cal. 260 [66 P. 259, 86 Am.St.Rep. 250, 54 L.R.A. 774]; *U-Drive & Tour, Ltd.* v. *System A. Parks, Ltd.,* 28 Cal.App.2d Supp. 782 [71 P.2d 354]; *Cunningham* v. *International Com. of Y.M. C.A.,* 51 Cal.App. 487 [197 P. 140]; *Constantian* v. *Mercedes-Benz·Co.,* 5 Cal.2d 631 [55 P.2d 841]; *William A. Davis Co.* v. *Bertrand Seed Co.,* 94 Cal.App. 281 [271 P. 123], in which disclaimer provisions and notices of limitation of liability were upheld. In these cases the statements were contained within the body of a document (such as a warehouse receipt, parking lot ticket, baggage check, etc.) which plainly purported to embrace the agreement between the parties, which thereupon became binding upon acceptance of the document regardless of whether the person accepting had actual knowledge of all the terms. They were an integral part of an accepted agreement embodied in a writing contractual in its nature, and could no more have been ignored than any other provisions of a written contract. Those cases, in considering the binding effect of a statement contained in an instrument delivered to the acceptor, represent an application of the rule stated by Professor Williston in his treatise on Contracts: "The sole question seems to be whether the facts present a case where the person receiving the paper should, as a reasonable man, understand that it contained the terms of the contract which he must read at his peril and regard as part of the proposed agreement. The precise facts of each case are important in reaching a conclusion." (Vol. 1, p. 165.)

The remainder of the cases cited are inapplicable since they differ materially from the factual context here present. In *Chas. Lomori & Son* v. *Globe Laboratories,* 35 Cal.App. 2d 248 [95 P.2d 173], plaintiff obtained judgment for breach of warranty in the sale of anti-hog cholera virus and serum. A motion for a new trial was granted on the ground of insufficiency of the evidence. In affirming, the court held that

the alleged warranty was *conditional* upon use of the medicine in the recommended fashion, and since there was great conflict as to the cause of the death of the hogs, the sanitary conditions on plaintiff's farms, and on the question of whether he used the medicine as prescribed, a new trial was properly granted. By way of dictum, the court discussed whether defendant's disclaimer of liability on the labels of its bottles relieved it of liability in view of its conditional warranty. The court pointed out that plaintiff admitted he read the labels and was therefore upon notice that defendant did not guarantee prevention of hog cholera under all circumstances. In *Gibson* v. *California Spray-Chemical Corp.*, 29 Wn.2d 611 [188 P.2d 316], an action to recover damages for loss of an apple crop occurring from spraying mildewed trees with a chemical compound purchased from defendant, the court found that no express warranty had ever been made, that plaintiff knew full well the product he was purchasing was still in an experimental stage, and that he was put on notice of a disclaimer at the time of the sale to him. *Hoover* v. *Utah Nursery Co.*, 79 Utah 12 [7 P.2d 270], did not involve an express warranty. The issue before the court was whether seeds purchased in a container on which was printed language of nonwarranty was nonetheless subject to an implied warranty. The court stated the evidence showed a universal custom not to warrant seed and sustained the trial court's finding that the sale was made pursuant to that longestablished custom, thus excluding any implied warranty. *Hawkins* v. *Frick-Reid Supply Corp.*, 154 F.2d 88, involved an action to recover the purchase price of an allegedly defective drill pipe on the grounds of breach of an express and implied warranty. The invoice was here treated as the contract between the parties and the dispute was simply as to the construction of the language therein. The trial court had granted a summary judgment in defendant's favor on the ground that the drill pipe was *machinery* or *machinery parts,* and hence not covered by the term *material* within the meaning of the warranty statements in the invoice clause. The case was reversed upon the ground that since the drill pipe might either be regarded as material or machinery, a question of triable fact was presented which precluded the rendition of a summary judgment. Apparently neither party disputed that their transactions were governed by the language of the invoice, the sole controversy relating to the meaning of such language.

■ The next point raised by India relates to its testimony that there was a general custom not to warrant paint. India contends that when a custom of the trade not to warrant is shown, it thereby establishes an intention not to warrant and eliminates any claim of an implied warranty. Though this may be true as an abstract proposition of law in the absence of an express warranty, it has no pertinency in a situation where express oral warranties have in fact been made. (*Miller* v. *Germain Seed & Plant Co.,* 193 Cal. 62, 66 [222 P. 817, 32 A.L.R. 1215]; *Webster* v. *Klassen,* 109 Cal. App.2d 583, 589 [241 P.2d 302]; *Moorhead* v. *Minneapolis Seed Co.,* 139 Minn. 117 [165 N.W. 484, 486, Ann.Cas. 1918E 481, L.R.A. 1918C 391]; *Coates* v. *Harvey,* 2 N.Y.S. 5, 6; see *Brandenstein* v. *Jackling,* 99 Cal.App. 438, 445 [278 P. 880].) The court stated in *Miller* v. *Germain Seed & Plant Co., supra*: "It is, of course, conceded that if there had been a written warranty *or an express oral warranty* of the character of the seed, the custom of the dealer in other cases not to give such a warranty would have no bearing upon the terms of the express warranty. (Italics added.)" In *Moorhead* v. *Minneapolis Seed Co., supra,* it is said: "Conceding the rule of law claimed, and that a custom not to warrant was conclusively proved, we are of the opinion that a vice president and general manager having such charge of the company's operations and such general authority as is shown had implied authority to make a warranty binding the corporation." In the case at bar, the evidence shows the third renewal of the express warranty in January, 1949, was made by Ray Sahm, vice president of India. The existence of a custom of non-warranty is not competent to change the contract of the parties as they themselves had made it with reference to an express warranty. (*Webster* v. *Klassen,* 109 Cal.App.2d 583, 589-590 [241 P.2d 302]; *Coates* v. *Harvey, supra.*)

■ India argues that the evidence is insufficient to support the finding that the paint it sold to United caused the stickiness of its Venetian blinds stripping material. We cannot agree. Prior to February, 1949, when India undertook to formulate a cheaper paint for United's operations, there was no trouble with sticky stripping. When this difficulty arose India revised its formula a number of times in an effort to remedy its product but the stickiness continued. India's experts testified that its preparation should not and would not stick if faithfully compounded and properly used.

On the other hand, Mr. Harlan expressed a contrary opinion, saying, in effect, that the absence of slick in the particular formulation, the excessive amount of amine resin, and the preponderance of slowly curing soya resin, would have a definite tendency to cause these paints to stick when used in United's ovens. Upon examining a piece of "tacky" stripping that had been returned by one of United's customers, a representative of India concluded that the paint was at fault. After United stopped using India's paint, in late June or early July, and began using the product of another manufacturer, it had no further appreciable difficulty with sticking.

Furthermore, the test runs made by the United States Testing Corporation, under the supervision of Mr. Brennan, were practical service tests in the opinion of Mr. Harlan and "established convincingly," to use the words of the trial court in summing up the case, "the defective quality" of India's last effort to produce a satisfactory paint for United's operations. India, however, insists that these tests were not run under typical production conditions. It maintains that United's equipment was stopped and cleaned in preparation for the test; that a representative of the chemical company which furnished the chemicals for cleaning the equipment supervised the cleaning process and that the temperature was above normal. Cleaning the equipment was not out of the ordinary procedure. This was frequently done at the start of a new production run. To have the equipment cleaned before the tests were run was desirable and conducive to accurate performance results and the elimination of extraneous interference. There can be no valid objection to the supervision of the cleaning process by a disinterested third party presumably familiar with the cleaning substances used. As to the temperature, Lloyd Pollett testified that under normal procedure the temperature in the topmost thermometer in the large oven was usually 520 degrees Fahrenheit. Mr. Brennan testified that he had checked the temperatures in the baking ovens at the time the tests were run and found the top thermometer in the larger oven read 520 degrees Fahrenheit, which was exactly normal for that thermometer. The higher temperatures to which India refers were taken at different points in the oven and are therefore not comparable for the purpose of determining normalcy. The testimony supports the judge's comment that "The conditions under which the tests were made were normal and constant." There was, says the court, "no shifting of the paint pans as contended" by one of India's witnesses

whom the court characterized as "quite unconvincing." The court further observed: "The claim that the oven was cooler in the center, enough cooler to affect the baking of the strips, does not impress the court at all. . . ."

United's evidence also disclosed that immediately after the stripping material was coated with enamel, no immediate defect was apparent, and no stickiness was encountered if the stripping was used promptly. However, stickiness occurred within two or three weeks on the painted surface of coils which remained unused. This delayed-action phenomenon affected both the aluminum stripping rolled on United's mills which underwent the cleaning process and the steel stripping purchased outside which was not cleaned but was fed directly into the painting equipment.

The foregoing evidence furnishes ample support for the finding that a latent condition in India's paint was responsible for the stickiness of United's stripping. From the mass of conflicting evidence the trial court was justified in drawing the inference that either India's experts were mistaken or there was some failure to properly compound the paint.

India, however, contends that Mr. Harlan was "not qualified" to express an opinion that its compounds here in question were "liable to stick" when used in United's process. Mr. Harlan is a consulting chemist from San Francisco who has operated his own paint research laboratory for more than 20 years. He has done work for every major paint manufacturer on the Pacific Coast including India. He had also rendered expert services for a number of companies in the Venetian blind manufacturing industry in connection with their baking enamels. In his practical experience he has had occasion from time to time to go into the subject of the constituents of baking enamels for Venetian blinds and to develop formulas that would produce satisfactory results in particular situations. As he explained, it was his job to make them work. True, as India points out, Mr. Harlan did not have an academic or professional degree. However, he had attended two well known universities. He was a "practical chemist" and experienced in this particular field. (See *Studerus Oil Co.* v. *Jersey City*, 128 N.J.L. 286 [25 A.2d 502, 506].)

It is for the trial court to determine, in the exercise of a sound discretion, the competency and qualification of an expert witness and its ruling will not be disturbed upon

appeal without showing an abuse of that discretion. (*Pearce v. Linde,* 113 Cal.App.2d 627, 630 [248 P.2d 506].) There was clearly no abuse of discretion in permitting Mr. Harlan to express an opinion as to the likelihood of stickiness occurring on United's stripping when painted with the particular formulations India had provided for United's equipment and baking process.

India emphasizes that during the particular period involved not all of United's stripping developed a sticky condition. It is then argued that if India's paint were defective all the stripping on which it was used would have stuck. The evidence shows that sticking did not occur when the stripping was used fairly soon after it was painted. If, however, it remained in the coils for a number of weeks stickiness developed. In considering this question the trial court concluded that India's argument on this point ''is answered primarily by the fact that this stickiness is a delayed process due principally to continued contact under pressure.'' This conclusion is not without justification. In this connection it should be pointed out that stickiness developed on both the aluminum and steel stripping. This would indicate the problem of sticking was not caused by the cleaning process applied by United to the aluminum stock since the steel stripping was pretreated and ready for the application of the baking enamel without cleaning. Yet stickiness also developed on the steel stripping.

India vainly argues that the evidence is insufficient to support the finding that its paint was responsible for the flash fires. In May or early June, 1949, approximately 150 flash fires occurred in about a three-week period. Prior to that time there had been no trouble with such fires. India insisted there was nothing wrong with its paint—that the trouble must be with United's oven. As a result, United dismantled its oven four times. Nothing except a couple of loose connections upon the first dismantling was found to be wrong with it yet the flash fires continued to occur. India thereupon tested the ingredients being used in the paint it was then furnishing United and discovered in its own laboratory that one of the constituent elements ''flashed fire'' at 31 degrees Fahrenheit. India immediately provided United with a reformulated paint and the flash fires ceased. United returned the old paint on hand and India issued full credit therefor in the sum of $4,624.20. India's own laboratory demonstration, the fact that United had no such fires prior

to this three-week period, that as soon as India changed its formula and eliminated the volatile substance these fires stopped, the conduct of India's representatives, and the absence of any defect in United's equipment, justify an inference that India's paint was at fault and support the court's finding to that effect. The court obviously was not impressed with India's expert witnesses in their attempt to prove that its paint could not have caused these fires.

Contrary to India's contention, the evidence fully sustains the finding that the flash fires and sticky stripping were due to a latent defect in its paint. As to the flash fire problem, there was nothing in the appearance of the paint or otherwise which suggested even its highly volatile character. This was not disclosed until it was in the process of being applied and baked. Clearly the defect was latent. Likewise there was nothing either before or after the application of the paint which indicated it would develop stickiness. When the stripping was finished it had a normal appearance and if used in a relatively short time there was no difficulty. The problem arose when the stripping remained in the coils a number of weeks and there was continued contact under pressure. This result was explained by Mr. Harlan on the theory that the paint contained materials that would produce a high surface hardness on the painted stripping and leave uncured or unpolymerized matter underneath the film which would then, under pressure, migrate to the surface and cause the sticking in the coils. The foregoing justifies an inference that the defect in India's product was latent and supports the finding to that effect.

India challenges the sufficiency of the evidence to sustain the finding (1) that India had full knowledge of United's processes, and (2) that United maintained reasonably normal and constant conditions in the operation of its equipment and processes. This challenge, however, is not well founded. The evidence shows that the representatives of India and its chief chemist, Mr. Canet, inspected United equipment, its operations and the finished product, and had free access to its plant. Mr. Canet testified he made service calls to United about once or twice a week prior to the period here in question, and during that period even more frequently. Chester Pollett had seen a particular oven of United's possibly 200 times. There was a free exchange of information between officials of the two companies. India had full opportunity to acquire any knowledge respecting United's

physical operations it required, and it availed itself of such opportunities. This was necessary because India was making paint for use in United's equipment. It had become India's largest customer. Naturally United wanted to turn out a good product. The quality of its enamel was an important factor in such a result. India of course desired to retain United's account. There were, therefore, persuasive business reasons for the close cooperation between the two companies and the familiarity of India with United's operations. The foregoing clearly justifies the finding that India had full knowledge of United's processes.

In its attack upon the finding that United maintained reasonably normal and constant conditions in the operation of its equipment and processes, India points to certain changes in United's equipment and operating procedure. To enumerate the details of these asserted changes is unnecessary since the trial judge dealt fully with this question in announcing his decision at the conclusion of the trial, when he said: "The many attacks upon United's baking process are unconvincing. Some are misplaced as to time; some are of an insignificant nature; some are essentially attacks upon the design and construction of the oven, and others are disbelieved. They are adequately offset by the previous and subsequent experience, by the result of the Brennan tests, and by the oral evidence of Lloyd Pollett, and others." Thus the trial court has resolved the conflicting evidence on these factual questions against India. Such resolution, reduced to a finding, under elementary principles, is binding on this court.

India claims the returned sticky stripping was not sufficiently identified as having been produced at United's Los Angeles plant. It suggests that some of this damaged stripping might have come from United's Jeffersonville plant. In considering this question the trial court pointed out that "India paint was not used at Jeffersonville and no trouble of that kind (stickiness) has been traced to that plant." The testimony of Lloyd Pollett supports this observation. India also suggests that it would be hard to tell United's white stripping from that of another manufacturer. However, each of the dealers who testified about returns said he had no difficulty in identifying the defective stripping which he had purchased from United. Further, Lloyd Pollett testified that as the coils were returned he would inspect either all or a representative sample, if there was a large shipment, and then the balance was checked by the receiving clerk.

In making these examinations Mr. Pollett had in mind the possibility some of the returned coils might have been originally shipped from the Jeffersonville plant. Mr. Pollett was able to distinguish the coils manufactured at United's Los Angeles plant from those manufactured at Jeffersonville by the glossy character of the paint, the finish on the aluminum coil stock, and the rubber stamp on the outside of the carton showing the initials of the particular operators of the forming machines. In summing up the testimony on this point the trial court said Mr. Pollett "found all returns to be the product of the Los Angeles plant and made with India paint . . . Mr. Pollett authorized the credits himself, mostly after India had repudiated its liability. The returns and the credits began to be heavy in the month of August, 1949. The repudiation occurred, I think it may fairly be said, in July. Mr. Pollett would not, under these circumstances, have recklessly approved a lot of credits and repayments to United's customers. There is a presumption of good faith on his part, and the Court believes his testimony that he did find what he says he found." From the foregoing it is clear there is no substance to India's claim that the returned stripping was not sufficiently identified as having been produced at United's Los Angeles plant.

The basic difficulty with this and other factual issues in this case is that India would have us reevaluate the credibility of the witnesses, reweigh the evidence and draw inferences therefrom contrary to those drawn by the trial court. Under well established principles, we are not at liberty to usurp the fact-finding function.

The record completely discounts India's claim that United enhanced damages by shipping out sticky Venetian blinds in insulated cars known as "reefers" when it knew of, or by the exercise of reasonable care could have discovered, this condition. These cars were used experimentally on two to four occasions in an attempt by United to cooperate fully in seeking to alleviate and abate the stickiness problem. It was not cognizant that its shipments were of defective material, since the condition was latent and it was lulled into a groundless security by India's repeated and unwarranted assurances that each reformulation had overcome the factor engendering the stickiness.

Other matters raised by India do not require discussion because they are inconsequential and could not justify a different result. This case was thoroughly and competently

tried, and we find no reason to disturb the determination made below.

The judgment is affirmed.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied March 31, 1954, and appellant's petition for a hearing by the Supreme Court was denied April 29, 1954. Shenk, Acting C. J., Carter, J., and Schauer, J., were of the opinion that the petition should be granted.