[Civ. No. 3144.   Fourth Dist.   June 2, 1944.]

PAUL PAUL, Respondent, v. IRVING WILLIAMS, Appellant.

Clyde E. Cate and Ralph Robinson for Appellant.

Chester R. Andrews for Respondent.

MARKS, J.—This is an appeal from a judgment awarding plaintiff damages in the sum of $2,054.50 for breach of an implied warranty in selling tomato plants which were unfit for the production of commercial fruit.

Plaintiff is a farmer who, during 1942, planted 40 acres of tomatoes. Defendant, under the name of Irving Williams Company, for several years had been engaged in the business of raising tomato plants for sale to farmers who raised tomatoes for commercial purposes.

The Riverbank Canning Company is a corporation engaged in the business of canning tomatoes and making tomato paste. We will hereafter refer to this company as Riverbank.

During the year 1942, Riverbank entered into numerous contracts with farmers who agreed to raise tomatoes for sale to it. Plaintiff agreed to raise 40 acres of San Marzanos and Pearsons for Riverbank. The San Marzanos, a pear shaped tomato, was contracted for at $19.50 per ton and the Pearsons, a round tomato, at $17.50 per ton.

Riverbank entered into a contract with defendant, evidenced by several letters, under which defendant agreed to raise 3,000,000 tomato plants for $2.75 a thousand. The negotiations on the part of Riverbank were initiated by a Mr.

Brockway. The first letter is from Riverbank to defendant, dated February 10, 1942, and after stating the number of plants to be grown and the price to be paid, adds: "We understand that the plants are to be guaranteed at the time they are pulled and ready for growers." Defendant replied under date of February 11, 1942, in which he confirmed the agreement with Mr. Brockway, and added: "Every effort will be made to produce the desired number of plants but we do not guarantee to supply this quantity if conditions beyond our control interfere, such as frost, insect damage, etc." Riverbank replied to this letter under date of February 12, 1942, and stated that it believed the letter of Williams represented the understanding with Brockway but expressea the intention of submitting it to him for checking. The next day Riverbank wrote defendant that the contents of the letters, with an exception not material here, had been approved. The writings are none too definite in defining the terms of the contract. There is no specification of the varities of tomato plants to be raised, and just what was meant by the statement in the first letter concerning the guarantee is not made clear.

Riverbank caused 50 pounds of seeds to be shipped to defendant which were used in planting the seed beds. Riverbank's agents inspected the seed beds during their preparation for planting. They were told that tomato plants and commercial tomatoes had been raised on some of the ground occupied by the seed beds. They also inspected the beds during the growing period and again when the plants were ready to dig and noticed some off variety plants growing among the true types. Williams testified that they told him to have some workmen precede the plant diggers and pull and remove the off variety plants so they would not be mixed with the true types; that he did this before digging the plants for delivery to the various growers.

The deposition of Williams had been taken and was used at the trial. In it he testified as follows: "MR. ANDREWS: And in general the terms of the agreement were what? . . . A. They supplied the seed, and charged me their cost for the seed, and I planted the seed under their direction shortly after the agreement was made. Q. And by 'their direction' what do you mean? A. Their field men inspected the land during the preparation of the seed beds and supervised the planting for the first few days. Q. Did they have anything

to do with the choice of where the—— what field you used? A. No. I took the field man to the ranch and showed him what land we had available at that time, and it was acceptable to them. . . . Q. I see. And when this contract was made, you contemplated that it was to be for the purpose of furnishing plants to these growers which Riverbank signed up, who were going to grow for Riverbank, is that right? A. That is correct.''

We find the following in Williams' testimony when called as a witness: ''Q. Did you ever know who Paul Paul was until—— or, I will withdraw that. When did you first know anything of Paul Paul? A. The Riverbank Canning Company, at the time we entered into an agreement to grow tomato plants, informed me that they would advise me of the various growers—— Q. Talk to the Court. A. Pardon me. Who would call for the tomato plants, and in due course of time we were advised that Mr. Paul Paul, or someone, would call for plants, and to keep a record of these growers, to facilitate them billing the growers for the plants. Q. Those instructions that you just referred to were received just prior to the delivery of these plants? A. That is correct.''

Williams testified that prior to his delivery of the plants to a grower, a representative of Riverbank would call him by telephone and inform him of the deliveries to be made with the name of the grower receiving the plants. He would then dig the plants and make the deliveries at the seed beds. He was paid for the plants by Riverbank.

Three invoices are in the record showing deliveries to plaintiff. We quote the earliest in point of time.

<div style="margin-left:2em">

**ORIGINAL — THIS IS YOUR INVOICE—NO OTHER WILL BE SENT**

"I R V I N G   W I L L I A M S   C O.
Commission Merchants
Growers — Shippers — Distributors
CALIFORNIA VEGETABLES          No. 395
Bakersfield, California

Sold to   PAUL PAUL          Date   5 - 7 - 1942

Address ................... Terms ...................

| 1942 Date | Tag No. | Description | Price | Amount |
|---|---|---|---|---|
| 5-4 | 6154 | 38,000 Pearson Tom Plants | @ $2.75 | $104.50 |
| | | | Total....... | $104.50 |

How Shipped   IRVING WILLIAMS CO.   Received above in
By Clarence W. Berg          good order
                              By

</div>

A second invoice in the same form showed the delivery and sale to plaintiff on May 6, 1942, of 12,000 Pearson and 26,000 San Marzano plants. A third invoice showed the delivery and sale to plaintiff on May 8, 1942, of 24,000 San Marzanos, 1,000 Pearsons, and 4,000 unnamed tomato plants. A receipt attached to the third invoice shows that 22,000 of the plants went to H. H. Bagdasarian, and that the 4,000 tomato plants unnamed in the invoice were Pearsons. This left a total of 83,000 plants delivered to plaintiff.

Plaintiff testified that he planted the 83,000 plants he received from defendant; that they were planted and cared for by Japanese experienced in tomato culture; that they were properly planted and cared for; that he had the vines dusted successfully for mites with the exception of one half an acre of Pearsons which was deliberately dusted with too heavy a dust which killed the plants in order to kill a bad infestation; that he thought he planted 25 acres of the Pearson variety and 15 acres of the San Marzano variety; that neither variety received from defendant in boxes marked "Pearson" and "San Marzano" were true to type but were a mixture of both varieties; that there were many mongrel plants of no particular variety mixed in with the other plants; that these mongrels did not produce merchantable fruit; that from 15 per cent to 20 per cent of the plants in the San Marzano 15 acres were of this mongrel type and Pearsons, and that from 50 per cent to 60 per cent of the vines in the Pearson 25 acres were mongrels that did not produce.

Plaintiff testified that he gave his promissory note to Riverbank for the cost of the plants which was paid when he delivered the tomatoes.

There is evidence that it was bad practice to plant a seed bed on ground that had been used to raise tomatoes for market or for seed beds for tomato plants; that unpicked tomatoes would fall to the ground and deposit their seeds in it; that these seeds would germinate and grow with the good seeds planted in the beds; that the mongrel plants in plaintiff's fields probably came from such volunteer plants growing in the seed beds; that it is difficult to tell the various varieties of tomato plants when they are ready for planting in the fields.

In addition to the loss of crop from the mongrel vines, their presence in the field added to the cost of picking as they were scattered through all the rows and the pickers had to pass

by those vines. The price for picking ordinary fields of tomatoes ranged from fifteen to twenty-two cents a box, while plaintiff was compelled to pay pickers from fifteen to thirty cents a box, and even at the higher price could not get the last of his crop picked. The record does not disclose the added picking expense caused by the presence of the mongrel vines nor the value of the tomatoes left on the vines.

It seems clear from the evidence that plaintiff suffered a material loss in the returns from his crop by reason of the mongrel type plants delivered to him by defendant which failed to produce tomatoes, or merchantable tomatoes, and that his picking costs were increased by reason of the presence of the mongrel plants in his field.

Defendant maintains that his only liability is under subdivisions one and two of section 1735 of the Civil Code. He argues that Riverbank and not plaintiff was the purchaser of the tomato plants; that plaintiff was unknown to him at the time of his contract to grow the plants; that there was no privity of contract between himself and plaintiff; that there must be privity of contract between the purchaser and the seller before the warranties implied in the two subdivisions of the section come into play. In support of his arguments defendant cites such cases as *Sutter* v. *Associated Seed Growers*, 31 Cal.App.2d 543 [88 P.2d 144]; *Asamen* v. *Thompson*, 55 Cal.App.2d 661 [131 P.2d 841]; *Rachlin* v. *Libby-Owens-Ford Glass Co.*, 96 F.2d 597, and *Sears, Roebuck & Co.*, v. *Marhenke*, 121 F.2d 598.

He also argues that subdivision one of the section cannot apply to the facts here because Riverbank, and not plaintiff, was the buyer, and that plaintiff, not knowing defendant, could not have relied on his skill and judgment in raising the plants; that subdivision two of the section cannot apply here because plaintiff, not being the purchaser, did not buy the plants by description.

We believe that in making this argument counsel does not give due consideration to the testimony of defendant. It is true that the letters evidencing the written agreement were signed by defendant on the one hand and by Riverbank on the other and not by plaintiff. It is equally true that defendant knew that Riverbank was not purchasing the plants for itself but for tomato growers who would contract to grow tomatoes. While the names of those growers were not known

to either party when the letters were written they were known and disclosed to defendant before the plants were delivered. The invoices clearly showed that in the instant case 83,000 plants were sold and delivered to plaintiff which were represented to be San Marzanos and Pearsons. This representation was not true as there were many mongrel plants among them. It is true that Riverbank paid defendant for the plants but in doing this it was merely advancing money for the accounts of the growers.

The conclusion follows that Riverbank was acting as agent for the growers who were undisclosed principals at the time the letters were written but became disclosed and were known to defendant before any deliveries were made. Defendant knew that the plants were to be used by the growers for the particular purpose of raising tomatoes for the market and should have known that the tomatoes were to be grown to be sold to Riverbank for use in its cannery, so, under the provisions of subdivision one of section 1735 of the Civil Code there was "an implied warranty that the goods shall be reasonably fit for such purposes." There was a breach of warranty to the extent of the delivery of the mongrel plants. The plants were sold under the name of "Pearson" and "San Marzano" which are descriptions of two particular varieties of tomatoes so there was "an implied warranty that the goods shall be of merchantable quality." This warranty was breached by the delivery of the mongrel plants. It follows that defendant should respond in damages to plaintiff to the extent he was injured by these breaches of the warranties.

Defendant argues that there is no proper proof of plaintiff's damages to support the judgment. In reply plaintiff points to his own evidence to the effect that he expended $3,414.31 in raising and picking the crop, receiving $1,717.81 for it, making a net cash loss to him of $1,696.50, and his further evidence that the rental value of his land was $1,200. He adds these two sums together and maintains that the result supports the judgment of $2,054.50 in his favor.

The amount of plaintiff's loss on his crop plus the rental value of his land is not a proper measure of his damages caused by the breaches of warranty by defendant. Section 3300 of the Civil Code provides that the measure of damages for breach of contract shall be "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

Section 3358 of the Civil Code provides that "notwith-standing the provisions of this chapter, no person can recover a greater amount in damages for the breach of an obligation than he could have gained by the full performance thereof on both sides," except in certain instances not important here.

Under the usual rule applied in cases of this kind, plaintiff should be entitled to damages in an amount equalling the difference between the amount he would have received for his crop, had there been no breach of warranty, and the amount he did receive. (*Staub* v. *Muller*, 7 Cal.2d 221 [60 P.2d 283].) This amount should reflect the higher picking costs caused by the presence of the mongrel vines as well as the shortage in the amount of crop produced, and should make allowances for the price of $2.00 per ton he received on Pearsons over the price originally fixed for that variety in his contract with Riverbank which was modified during the picking season.

We have searched the record and have found nothing on which we might base any fairly accurate estimate of the loss suffered by plaintiff by reason of the breach of warranties by defendant. While this is true, no good reason appears why we should set aside the judgment insofar as it fixes liability on defendant for his breaches of warranty. We can reverse the judgment and remand the cause for new trial solely on the issue of the amount of damages. (*Pretzer* v. *California Transit Co.*, 211 Cal. 202 [294 P. 382].)

The judgment is reversed and the cause is remanded for a new trial solely upon the issue of the amount of damages, with directions to the trial court to make findings on liability in accordance with the views herein expressed and the evidence already taken, and on the amount of damages in accordance with the evidence to be taken, and enter judgment for plaintiff in that amount.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied June 30, 1944.