[Civ. No. 4331. Fourth Dist. Mar. 4, 1952.]

RANSON W. WEBSTER et al., Respondents, v.
G. L. KLASSEN et al., Appellants.

Kendall & Howell and Virgil C. Dowell for Appellants.

Samuel Taylor and Siemon & Siemon for Respondents.

GRIFFIN, J.—Plaintiffs owned about 30 acres of potato land near Pixley. Defendant's business consisted of financing potato growers, selling potato seed and fertilizer, and the packing and selling of potatoes.

About July, 1949, plaintiff Mr. Webster (hereinafter referred to as plaintiff) went to defendants to obtain crop financing of his acreage. Defendants inquired about his experience in growing potatoes, etc., and agreed to finance

him upon the giving of certain mortgages upon the crop and implements. He was referred to defendants' agent, Mr. Hall, who took plaintiff to the warehouse. There, according to plaintiff's story, he told Hall that he was interested in "a good cold storage B grade" (smaller size) seed potato with a good rest period, and that he would prefer a certified seed. An outline of plaintiff's testimony in this respect is as follows:

". . . Mr. Hall showed me a slip of paper with the car numbers and government gradings of the different types of seed potato they had; and at that time they had in the warehouse, I think he said it was around five hundred and some odd sacks of these seeds they had left. They were Arthur Johnson, double O's rating, Washington seed, and which he informed me had a rest period of 90 days or better.

"Q. Did you examine the seed there?

"A. I did. They were very nice seed.

"Q. At the time, the potatoes were whole and uncut?

"A. That is right.

"Q. Did you have any further conversation with Mr. Hall?

"A. I told him those seed would be fine and he asked me about how many sacks it would take, and I said I felt around 510 to 520 sacks; and he stated I *would get those seed*."

On cross-examination he testified:

"Q. Where, if anywhere, did you see the words 'Arthur Johnson Double O rating'?

"A. It was on a piece of paper Mr. Hall showed me, and he said, 'That is the characteristic of the seed here, and here is the Government rating on it.' . . .

"Q. And did you specifically request his seed?

"A. No, Mr. Hall said he had several types of seed over there, cold storage seed, and he said some of the Metler strain; and he also showed me different things he had, and I told him I would like to have *this Arthur Johnson B's double O rating*." (Italics ours.)

According to the testimony, Arthur Johnson Double O Washington seed, to the grower, had a definite meaning, i.e., it is considered one of the best, that it has a rest period between plantings of at least 90 days, which makes it exceptionally good for germination; that the B grade is only a smaller potato from the same stock, but it is not certified. On rebuttal, plaintiff stated:

"Q. And did you—was any statement made to you at the time to the effect the seed had been locally grown in the spring?

"A. No, he showed me this slip of paper, which other growers also seen, stating it was Arthur Johnson double O rating Washington seed, grown up there, and that it had a 90 day or better rest period. . . .

"Q. Did you see any B's there in the Arthur Johnson sacks?

"A. There were some B's in the Arthur Johnson sacks I am almost certain. He told me they were Arthur Johnson seed."

It was plaintiffs' contention that the seed furnished them was not the seed shown to them and was unfit for planting.

Defendants admit that plaintiff did not get the named brand of seed. A few days later, on August 3, 1949, plaintiff signed a note and mortgage for $3,750, and an agreement whereby defendants were to advance certain money to plaintiffs and that plaintiffs were thereby compelled to buy seed potatoes from defendant company at the prevailing market price. They were to be cut for seed by defendants' agents. Plaintiff then testified that he prepared his land for planting, took his truck to defendants' place of business and picked up a load of cut seed potatoes to plant; that on arriving there, defendants' cutter, a Mr. Bradley, stated he was not quite sure which potatoes plaintiff was supposed to obtain; that plaintiff told him he was to get "Arthur Johnson Washington seed" and the cutter said: "I don't think we got any of that cut." He then testified that Mr. Bradley had been cutting seed for others and that after some time he said: "This is the seed you are supposed to take." He then stated that he hauled away the necessary fertilizer and about 100 sacks containing cut seed potatoes, and planted them, and came back for more and later planted them; that after several weeks he checked the seed on the first 8 acres planted and they showed up "very bad," i.e., rotted and spotted growth; that he called defendants about it and their field man felt it was due to a certain "gyp dip" they put on that batch, and accordingly defendants furnished additional seed to replant the 8 acres; that he subsequently tested the other planting and found that much of the seed had failed to germinate and also found that "heat nucrosis" was in most of it; that the crop was so sparse and spotty that he stopped cultivating it; that the defendants and their

agent Hall, as well as other neighboring potato farmers, observed these conditions on two or three occasions; that he abandoned the crop and told defendants' agent that if he wanted to come and take over the crop he could do so; that the agent asked him to take it up with defendants and they would take care of it; that nothing was done by them and that his lawyer, on October 4, wrote to defendants, claiming damages for misrepresentation due to the furnishing of inferior seed; that his crop would have matured ordinarily in November or December; that no potatoes were harvested because it would not have paid to harvest them; that potatoes in that territory were averaging about 200 sacks to the acre and that the price obtained was about $3.50 to $4.25 per sack. This action followed, resulting in a jury verdict for plaintiffs for $5,000, and against defendants on their cross-complaint.

Defendants testified generally that plaintiff did not order any particular variety of seed potatoes; that there was no such named brand as Arthur Johnson double O Washington (B grade) certified; that the seed ordered by plaintiff and sold to him was a "B grade" potato raised from a strain of Arthur Johnson seed in the previous year on land near Pixley; that plaintiff examined the seed potatoes and took that grade because they were less expensive than certified seed; that plaintiff saw some of them being cut and, according to his own statement, noticed that some were rotted and had evidence of "heat nucrosis"; and that since he continued to plant the seed, knowing of that condition, he was obligated to reject it and inform defendants of its condition and not plant it; that plaintiff proved to be an inexperienced farmer; that his method of planting was the cause of the failure of the crop rather than the quality of the seed; that defendants had no notice of plaintiffs' claim of inferior quality until the receipt of the letter of October 4th; and that after that date defendants discovered the crop was too far gone to do anything with it.

Defendants sought, by cross-complaint, the recovery of $3,442 representing cash, seed, and fertilizer advanced to plaintiffs. They produced certain testimony that it was the custom of the trade not to warrant the productivity of potato seed, whether certified or not. No recovery was sought on the mortgage because of the crop failure and due to the known fact that plaintiffs' implements were being bought

on contract of purchase and were later reclaimed by the sellers.

As to point number one, defendants claim that since plaintiffs base their case upon the allegation that they were to receive a certain brand name of seed and further allege that they failed to obtain this type of seed and by reason thereof they sustained damages, the verdict in their favor, based upon this allegation of express warranty, cannot be sustained where their testimony discloses that they requested and obtained a different type and grade of seed. We see no merit to this contention. The question of whether plaintiffs requested and obtained a certain brand name of seed was a question for the jury to determine.

As to point number two, defendants argue that in the absence of an express warranty, where the plaintiffs base their cause of action upon an implied warranty as to the fitness of the seed, and where there is undisputed evidence that there is a custom in the trade not to warrant the productivity of the seed, a verdict for the plaintiffs cannot be sustained upon the theory that the seed sold to the plaintiffs was unfit and failed to produce a crop.

The complaint alleges the basic facts generally and also alleges that at the time plaintiffs entered into the contract with defendants, defendants "expressly stated, represented and declared that the seed potatoes which would be furnished would be Arthur Johnson (Washington) double-O seed from cold storage, with 90-day or better rest period; that plaintiffs then and there . . . relied upon the sellers' skill and judgment as to the quality and fitness of said seed for such purpose. . . . Thereafter, defendants delivered to plaintiffs certain seed potatoes under the terms of said contract to be used in planting said lands, and orally represented to plaintiffs that said seed so delivered was one of the quality above mentioned and fit for the purposes above stated; and the plaintiffs planted said seed in a good and farmerlike manner in accordance with the terms of said contract, . . . Notwithstanding the facts above alleged, said seed was unfit to be planted and utterly worthless . . . and that by reason thereof the plaintiffs lost their crop. . . . Defendants breached and violated the implied warranty that said seed potatoes were reasonably fit for the purposes for which they were sold, which arose out of the transaction above alleged; and that by reason thereof the plaintiffs have been damaged in the sum of EIGHTEEN THOUSAND DOLLARS ($18,000.00)."

It is difficult to determine whether plaintiffs, in their pleadings, were relying upon the breach of an express warranty, the breach of an implied warranty, or the breach of a contract.

Defendants rely principally upon *Miller* v. *Germain Seed & Plant Co.,* 193 Cal. 62 [222 P. 817, 32 A.L.R. 1215], wherein it is held that evidence of custom is only admissible under the theory of implied warranty and must be considered in determining the intent of the parties and is, in fact, a part of the contract, unless the contract manifests a contrary intent. However, it is particularly stated that if there has been a written warranty or an expressed oral warranty of the character of the seed, the custom of the dealer in other cases not to give such a warranty would have no bearing on the terms of the express warranty. The evidence pertaining to the custom, if it may be considered at all, is quite unsatisfactory. The witnesses, in this respect, testified that the custom of the trade with reference to guaranty or warranty of performance of seed was that "they did not guarantee it; the custom is there is no guarantee on seed. . . . Well, there is no warranty as to their production." As pointed out in *Miller* v. *Germain Seed & Plant Co., supra,* the custom must be a general custom, and not an individual custom of an individual seller, or a purely local custom, of which the buyer is ignorant. ". . . 'To be regarded as part of the contract, however, the usage or custom must have both of the foregoing elements. (1) It must be actually or constructively known; and (2) it must be consistent with the contract. If either of these elements is lacking the usage or custom cannot be regarded as part of the contract. If the usage is neither actually or constructively known to one of the parties to the contract, it is not binding upon him.' "

In *Security Com. & Sav. Bank* v. *Southern Trust & Com. Bank,* 74 Cal.App. 734, 749 [241 P. 945], it is stated that before a custom can enter into or affect the rights and liabilities of parties in their dealings with each other, such custom must be certain, uniform, and either known to those sought to be charged thereby, or so generally known and notorious that knowledge and adoption thereof must be presumed.

In this respect the jury was accordingly instructed. The matter was submitted to it and the verdict was against the defendants. Whether or not a certain custom existed becomes immaterial if there was sufficient evidence to sus-

tain the judgment on the basis of a breach of an express warranty.

We have made independent search of authorities to determine whether or not a sale by description constitutes an *express,* as distinguished from an *implied* warranty. (See 7 So.Cal.L.Rev. 96, 100; 9 So.Cal.L.Rev. 169; 7 Cal.L.Rev., p. *360; 12* Cal.L.Rev. 523; 164 A.L.R. 1321.) Section 1732 of the Civil Code defines ''expressed warranty'' as:

''Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. . . .''

Section 1734 of the Civil Code recites that:

''Where there is a contract to sell or a sale of goods by description, there is an implied warranty that the goods shall correspond with the description. . . .''

The culmination of our efforts is disclosed in 46 American Jurisprudence page 563, section 385, wherein it is stated:

''By the great weight of authority, the sale of seed, bulbs, trees, or nursery stock as of a certain variety—in other words, a sale by description—constitutes a warranty that the property furnished is of the variety described, . . . There is a difference of opinion as to whether such a warranty is express or implied.''

Thirty or forty cases and references are cited for this general statement, including several California citations such as *Miller* v. *Germain Seed & Plant Co., supra*; and *Shearer* v. *Park Nursery Co.,* 103 Cal. 415 [37 P. 412, 42 Am.St.Rep. 125]. See, also, *El Zarape Tortilla Factory, Inc.* v. *Plant Food Corp.,* 90 Cal.App.2d 336, at page 345 [203 P.2d 13], where it is stated:

''Where the terms of an agreement designate the particular quality of a commodity to be delivered in phrases which are well known in the trade of the particular commodity purchased and sold, such description and designation amounts to an *express warranty.*'' (Italics ours.) Citing *Brandenstein* v. *Jackling,* 99 Cal.App. 438, 446 [278 P. 880], and many other California cases holding such warranty to be an ''express warranty.''

We do not wish to add to the confusion, but content ourselves with the general proposition that the testimony produced by plaintiffs indicates that a warranty did arise and that the evidence is sufficient to bring it within the definition

of an express warranty, as defined in section 1732 of the Civil Code. A section of the Uniform Sales Act pertaining to warranties was construed in *Parrish* v. *Kotthoff*, 128 Ore. 529 [274 P. 1108]. It was there said:

"Under the facts proven, it is wholly immaterial whether the action be considered as an action for breach of contract or for breach of warranty, for, if treated as one or the other, defendant is liable for his failure to furnish the kind or variety of seed which he had agreed to sell, and there is no difference in the damages recoverable therefor."

In *Brandenstein* v. *Jackling*, 99 Cal.App. 438 [278 P. 880], a somewhat similar situation arose, and the court held that considering appellant's failure to deliver all No. 1 rice as a breach of contract, instead of a breach of warranty of quality, the judgment appealed from would be equally supported under the pleadings.

In *Brock* v. *Newmark Grain Co., Inc.*, 64 Cal.App. 577 [222 P. 195], a case quite factually similar to the instant case, it was held that the warranty may be an oral warranty and that where the circumstances surrounding the sale are such as to amount to a representation of fact on the part of the vendor that the article sold is of a particular kind as ordered in terms, he will be held to warrant the article as being of that kind, although he may not have made any declaration in words to that effect. (See, also, 46 Am.Jur. p. 495, § 313.)

While the evidence produced by defendants might justify a conclusion that only an implied warranty arose, the question whether there was an express warranty or an implied warranty was a factual question for the jury to determine.

In support of the judgment we must conclude that the jury adopted plaintiffs' evidence as opposed to defendants' evidence that an express warranty was established or that there was a breach of contract in defendants' failure to deliver the named brand of seed potatoes ordered.

Defendants next argue that plaintiff, upon his first ascertainment of the fact that the seed potatoes were not what he ordered or were "unfit to be planted and utterly worthless" as alleged in his complaint, he was obligated to immediately notify defendants of any breach of said warranty under section 1769 of the Civil Code.

In this connection it is argued that since plaintiff testified he saw potatoes being cut for seed by Bradley, and they bore some evidence of heat necrosis and rot, he was charged

with knowledge of their condition before he planted them. His testimony is that he did not know who was receiving the seed that was being cut because they were cutting for other farmers at the same time; that after he hauled away the second load he told Hall he thought there "were some two's" in it and he asked him if he was getting Washington seed and Hall told him he was getting the seed he ordered; that being reassured of this fact plaintiff continued to plant the seed potatoes and did not discover that they had rotted or become infected with heat necrosis until they failed to germinate; that as to the first eight acres he did call defendants and they also discovered an unsatisfactory condition and furnished potatoes for replanting.

■ Inspection does not necessarily waive all defects. A buyer still might claim a breach of implied warranty as to defects which a reasonable examination would not have revealed. ■ The burden was upon defendants to show that plaintiff had information sufficient to put a reasonably prudent person upon inquiry. (20 Cal.Jur. p. 239, § 7; 7 So.Cal.L. Rev., p. 102; Civ. Code, § 1735, subd. (3).

It is not reasonable to believe that plaintiff should have known that these particular seed potatoes, in their cut form, were not, in fact, Arthur Johnson Washington Double O seed potatoes or that before planting, he should have known they would not germinate, if planted. The evidence shows that plaintiff did call Hall's attention to the lack of germination at the earliest possible moment and he was told that defendants could take over the crop if they so desired, otherwise, plaintiff was going to "take steps," and nothing was done by defendants other than to furnish other seed potatoes for the first eight acres. Thereafter, the written notice was given to defendants.

■ This question, as well as the question of the reasonableness of notice was submitted to the jury under proper instructions and resulted in a finding against defendants' contention. We are unable to hold, as a matter of law, that any delay in giving notice was unreasonable.

It is next argued that since plaintiff continued planting defective seed potatoes after he discovered their defective condition, his measure of damages was limited to the cost of replacing the defective seed with other seed, citing section 1789, subdivision 6, Civil Code; *Oliver* v. *Hawley*, 5 Neb. 439; and *Buckbee* v. *P. Hohenadel, Jr., Co.*, 224 F. 14 [139 C.C.A. 478, L.R.A. 1916C 1001, Ann.Cas. 1918B 88].

The question assumes a false premise in this, that plaintiff knew the potatoes were defective and would not grow or germinate, or that they were not the particular brand ordered. ▮ Plaintiff submitted to the jury a proper instruction as to the measure of damages, predicated upon a breach of contract or warranty, as indicated in *Paul* v. *Williams,* 64 Cal.App.2d 696 [149 P.2d 284]. No instruction as to any different measure was offered by defendants. This question appears to be raised for the first time on appeal and should not, therefore, he considered. (*Durkee* v. *Chino Land & Water Co.,* 151 Cal. 561 [91 P. 389]; *Duffey* v. *General Petr. Corp.,* 93 Cal.App.2d 757 [209 P.2d 986].)

As to point five, defendants also contend that plaintiff, upon discovery of the defective seed, should have discontinued planting that seed and planted other seed in order to minimize or mitigate his damage, citing section 1789, Civil Code, subdivision 1, (a) to (d) inclusive; and 8 California Jurisprudence, page 782, section 43. Plaintiff, apparently, did this very thing in reference to the eight acres, and from his testimony, he did not discover that the seed would not germinate until he had planted it, awaited the germination period, and then made the inspection. According to defendants' own testimony, it was then too late to plant another crop. We see no merit to this argument.

The last point is that since plaintiff admitted that he received the amount of cash, the fertilizer and seed potatoes as set forth in the cross-complaint, and that since he admittedly had never paid any part of it, it was error for the jury to fail to find in defendants' favor on their cross-complaint, citing *Rossi* v. *Beaulieu Vineyard,* 20 Cal.App. 770 [130 P. 201].

The court instructed the jury as to the legal measure of plaintiffs' damages, if any, less "the amount they owe defendants for fertilizer, the amount they owe defendants for the seed potatoes, and the amount of cash advanced to them by defendants."

Since the testimony as to the damages suffered by plaintiffs exceeded the amount of the judgment allowed, plus the amount of the claim on the cross-complaint, there is no merit to the argument that the jury did not follow the instructions given on the subject matter.

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.