[Civ. No. 86. Fifth Dist. May 1, 1962.]

LOUIS HAYMAN et al., Plaintiffs, v. A. C. SHOEMAKE et al., Defendants and Respondents; DICK CAREY et al., Defendants and Appellants.

Sedgwick, Detert, Moran & Arnold, Gant & Gant, Wilbur Legg and Scott Conley for Defendants and Appellants.

Zeff, Halley & Price and William Zeff for Defendants and Respondents.

CONLEY, P. J.—The cross-defendants, Dick Carey and F. H. Woodruff & Son, Inc., appeal from a judgment in favor of the cross-complainants, A. C. Shoemake, Walter Gnesa, Francis Gnesa and Henry Gnesa, for $93,523.68 based upon a sale of onion seed.

The plaintiffs, Louis Hayman and George Covert, purchased from the defendants and cross-complainants an interest in the field of onions grown from the seed and sued the defendants on their express warranty that the onions were Asgrow Y-50's, a particular variety which had previously produced excellent crops in the San Joaquin Valley. The cause was tried without a jury, and the court awarded plaintiffs, as against defendants, the sum of $66,182.68. No appeal was taken from the judgment for plaintiffs against the defend-

ants, and it has become final. The amount awarded plaintiffs was in turn included in the $93,523.68 awarded the cross-complainants. One of the cross-defendants, the Dompe Supply Company, was awarded judgment in the court below, and it has secured a dismissal of the appeal as to it. (*Shoemake* v. *Carey* [*Hayman* v. *Shoemake*], 199 Cal.App.2d 796 [18 Cal. Rptr. 916].)

The two main questions raised on the appeal from the judgment on the cross-complaint are whether cross-defendants are liable on a theory of warranty, and if so, whether the damages awarded are proper.

In 1956 and 1957, A. C. Shoemake and three Gnesa brothers constituted a general farming partnership operating in the Patterson area of Stanislaus County. Henry Gnesa was in charge of the agricultural operations, while Shoemake handled business, accounting and labor problems. For many years George Covert and Louis Hayman had carried on a produce business in the area, dealing largely in onions and tomatoes. The Dompe Supply Company (hereinafter called Dompe) was a local supplier of seeds, insecticides, fertilizers and agricultural chemicals. F. H. Woodruff and Son, Inc., a corporation (hereinafter called Woodruff), was engaged in the seed business in California and other western states. The cross-defendant, Dick Carey, was a sales representative of Woodruff for the territory in California from Sacramento to the Imperial Valley.

Asgrow Y-50 is a hybrid onion seed which was originated and sold only by Asgrow Seed Company, Inc. If planted directly in the ground in the Patterson area in the month of November, this seed would produce medium-sized, yellow, globe-shaped onions, ready for harvest in the following June, with only a small amount of bolting, or early seeding. This particular seed was produced for sale in the year 1953, and the first commercial crops grown from it in the San Joaquin Valley were planted in the fall of 1954 and harvested in 1955. The Asgrow Company was not able to produce any Y-50 seed in 1956.

In the summer of 1956 Shoemake and Gnesa desired to plant 85.6 acres of Asgrow Y-50 onions; Henry Gnesa personally had complete charge of the negotiations for the purchase of the seed. He was told by a Dompe employee that Asgrow was completely out of Y-50 seed, but that he would inquire elsewhere for seed of the same type; he telephoned to one Whikehart, Woodruff's Sacramento sales manager, saying that

Asgrow had no available Y-50 seed and that a customer wanted to secure something as good. Whikehart instructed Carey to call on Dompe and told him that Dompe might want him to talk with Dompe's prospective purchaser. Carey saw Dompe, who discussed the seed with him and asked him to see Gnesa about getting Woodruff and Gnesa together and, ". . . to make arrangements on what that covers." Carey called on Gnesa and represented to him that the Woodruff onion seed had the same characteristics as Asgrow's Y-50 seed. Mr. Carey testified as follows:

"Q. Then, your superior told you to represent this to have the same characteristics as the Y50, is that correct? A. That is correct, yes, sir.

" . . . . . . . . . .

"Q. In fact, Mr. Whikehart had told you, had he not, that there was a call for Y50 onions down in the Patterson area, to go down there and sell some Early Yellow Hybrid Globe? A. Yes, sir.

"Q. And he intended you to make those sales to growers or brokers or anyone who would buy them from you on that basis, isn't that correct? A. That is correct.

"Q. And he told you it had the same qualities and the same characteristics as the Y50 onion? A. He said it was the same kind of an onion."

Carey had never seen the Early Yellow Globe Hybrid onion grown in this part of the country, and he had no personal knowledge as a basis for making a comparison of the onion with the Y-50. He testified that in his conversation with Henry Gnesa he followed the instructions given him by Mr. Whikehart in representing the onion and that Mr. Gnesa took his word for it.

Carey testified as follows:

"Q. May I suggest, Mr. Carey, that at the time you took the contract and wrote the order, you had some reservation in your mind about whether this was the kind of onion which the people had wanted and which you had sold? A. That is correct.

" . . . . . . . . . .

"Q. Mr. Carey, you, I believe, testified in your Direct Examination that you told Henry Gnesa that was the same kind of onion as the Y50. A. I did say that, yes, sir. I said it was the same kind.

"Q. And you said that you were reading to him from the catalog at the time? A. Yes.

"Q. Now, had you ever compared the descriptive literature in the catalog of the Woodruff Company with that of the Associated Seed Company? A. I never had, no.

"Q. Now, never having made a comparison on the basis of the descriptions of Woodruff as against the Asgrow product, how could you make that statement to us? A. I did from my instructions from my superior, the sales manager.

". . . . . . . . . . . .

"Q. Now, you testified this morning that you were concerned about whether the variety of seed which you had sold was the right seed for this area, isn't that correct? A. That is correct.

"Q. Now, when you say you asked Harold Whikehart to find out if he had any further information, how did you do that? A. I wrote a report and attached it to the contract.

"Q. To this form of agreement? A. Yes.

"MR. ZEFF: Q. Will you produce it please?"

The report from Carey to Whikehart is most illuminating. It reads:

"Harold Whikehart— 8/17/56

"Enclosed—contract with Dompe Supply Co. The grower is Henry Gnesa—who I saw, and *convinced* him our hybrid Ea. Yellow Globe onion is the *same* as Y-50—he was quoted $7.75 lb. on Y-50 from Asgrow! So I told him Dompe would meet the price or we would—so if 8.45 less 20% could be sliced down a little it would give Dompe a better profit—

| | |
|--------|--------|
| 8.45 | 7.75 |
| 1.690 | 6.76 |
| 6.76 | .99 profit |

"I guess it would be O.K.

"*Now*—believe we should find out from Milford—if they think our onion would be equal at the same planting time— (Fall) etc. as Y-50 of Asgrows?? To protect us, because we have Gnesa boys using our carrot—watermelon etc. & pepper —and we do not want to get in wrong with the wrong onion!! I have the description of our hybrid Ea-Yellow Onion—with that brochure on the hybrids—but I have *no* Asgrow catalogue etc. to compare!

"Also, Gnesa would like us to advise if this onion seed (ours) will be short—because they may want 100 lbs. more.

 Dick!"

There was still another memorandum forwarded to his superiors by Dick Carey which read as follows:

".. . . . . . . . . . . . . .

"*More important!* I am to get in touch with Mac next week —to meet him and go out and see a grower that wants to plant hybrid Yellow Globe onion—but wants onion like the Y-50 again! So *can* I step out again and say it is the same type and *growing season* onion, etc.??

"I'll go ahead but please do all you can to still find out if this onion of ours *will equal the Y-50.* You know there is a Y-51, etc.—but the Y-51 is different than the Y-50—*earlier* onion—growing or planting type!"

The trial court found that the representation by Carey to Gnesa was that the Woodruff seed ". . . would produce an onion having the exact same qualities as . . . the 'Y-50,' " and this finding is supported by substantial evidence. It is maintained by appellants in their briefs that their representations as to the seeds did not include any undertaking as to their time of development; in this connection, respondents depend in part for their damages on the claim that late development of the seed caused serious prejudice to them in the market. The period of development under given conditions is a quality inherent in the seed, and the respondents are correct in their general contention that if there was a warranty that the seed had the same qualities as the Asgrow Y-50 seed, this would include a representation as to the time of maturity.

After talking with Gnesa, Carey returned to Dompe's office where there was prepared and signed by them a form, "Seed Growing Contract Order and Agreement," for 200 pounds of Woodruff Hybrid Early Yellow Globe; this document contained a provision as to warranty:

"7. Except as herein otherwise expressly provided, *the seller warrants to the extent of the purchase price that seeds or bulbs sold are as described on the container, within recognized tolerances. Seller gives no other or further warranty, express or implied.*"

Dompe admitted on the witness stand that he personally was aware that other seed companies operating in this portion of the State similarly limit their warranties and their liability. On August 31, 1956, Dompe secured from Woodruff an additional 100 pounds of this seed after signing a similar form of order and without any additional conversation having occurred between Carey and Gnesa. Woodruff delivered 300 pounds of the seed to Dompe at a 20 per cent discount under

retail price and was paid by Dompe; Dompe in turn delivered the seed to the Shoemake and Gnesa partnership, collecting the full retail price and disregarding Carey's earlier discussion of price with Gnesa.

The seed was planted early in November 1956, and the plants emerged from the ground in January of 1957. In April Shoemake began to discuss with Covert the possibility of a sale and purchase of the field. At that time Shoemake did not know of the previous negotiations between Woodruff's salesman and Gnesa, as he had not talked with his partner about it. Nevertheless, Shoemake assumed that the growing onions were Asgrow Y-50's, and he told Covert that they were. Shoemake admitted, ". . . somewhere along the line before discussing the onions, I told Mr. Covert that they were Y50 variety of onions." An agreement for the sale and purchase of the field was made and confirmed in a letter from Covert to Shoemake dated May 29, 1957. At the end of the trial, the court found that ". . . said onions were warranted and represented by the defendants as having been planted and grown from a seed known as 'Y-50'; . . ." Hayman and Covert agreed that they would pay Shoemake and Gnesa the sum of $400 per acre and would handle the harvesting and selling of the crop at the rate of $1 per 50-pound bag; after this charge was deducted, all proceeds above the $400 per acre guarantee would be divided equally as profits between the two partnerships.

The two elements in connection with which the cross-complainants allege that the seeds actually sold and warranted differed from the Asgrow Y-50 seeds were first, that the onions bolted, or prematurely went to seed, to a much greater extent than Y-50 onions would, and second, that the maturity element of the seed resulted in a delay in the production of salable onions, which adversely affected their price in a falling market.

Onions which have bolted are unmarketable and constitute a total loss to the grower. The record shows that there was a bolting of approximately 50 per cent. Asgrow Y-50 onions grown that year in a field within the general area had less than 1 per cent bolting.

Because of the fluctuation of the market, the selection of the time for the harvest of onions is one of the important factors making for financial success or failure. There was a considerable discrepancy in the opinions of various informed

witnesses as to when harvest should have begun and whether it was efficiently completed, but the trial court's findings on this subject are supported by substantial evidence.

There were produced and sold 42,634 sacks of No. 1 Woodruff onions from the 85.6 acres, the average yield being about 500 sacks per acre. Plaintiffs computed their alleged damages in two parts, the first consisting of what they termed their "out-of-pocket costs" on the transaction, and the second being an alleged loss of profits. This is how the plaintiffs calculated their damages:

| | |
|---|---|
| Guarantee paid Shoemake and Gnesa at $400 per acre | $34,240.00 |
| Extra cost of windrowing caused by bolting | 4,310.76 |
| Extra harvest cost because of bolting | 426.34 |
| Total out-of-pocket cost | $38,977.10 |
| Net proceeds of sale after deducting cost of windrowing and $1.00 per bag for harvesting | 135.42 |
| Net out-of-pocket cost | $38,841.68 |

The net proceeds of the sale after deducting the cost of windrowing and harvesting were computed by subtracting from the net amount realized from sales of the onions ($49,220.18) the normal cost of harvest of $1.00 per bag ($42,634) and the total cost of windrowing $6,450.76).

In computing their loss of profits Hayman and Covert assumed that if the field had been planted to Asgrow Y-50 onions as represented by Shoemake, it would have yielded 82,784 sacks of onions and would have been harvested so as to sell between June 15 and July 1; they assumed that they could have sold all the onions at an average net price of $2.10 per sack after deducting brokerage commissions and incidental expenses and that they would have realized $173,846 from the sale. From this total they deducted the following items:

| | |
|---|---|
| Normal cost of harvest at $1.00 per sack | $ 82,784 |
| Guarantee at $400 per acre | 34,240 |
| Normal cost of windrowing at $25 per acre | 2,140 |
| Total deductions | $119,164 |

The net profit remaining was computed at $54,682, which under plaintiffs' contract with defendants would have been divided equally between them. Plaintiffs added their half of the $54,682 profit, or $27,341, to their net "out-of-pocket

cost" of $38,841.68 to obtain total computed damages on the complaint of $66,182.68.

One of the basic assumptions of respondent is that because there was a judgment in favor of the plaintiffs against the defendants for $66,182.68, this sum, without further inquiry, should be incorporated in the judgment on the cross-complaint. This assumption is erroneous.

The applicable warranty upon which plaintiffs sued is thus alleged in paragraph VI of the complaint: "That said seed was in all respects exactly the same as a certain onion seed known as 'Y-50'; and would produce onions of a like kind and quality as those produced by the 'Y-50' seed."

While in the findings relating to the complaint there is a statement "That all of the allegations of the complaint are true," there are later specific findings which must take precedence over the general finding. (48 Cal.Jur.2d, Trial, § 311, pp. 313-314.) The specific finding with respect to the warranty by defendants to plaintiffs is:

". . . that as a part of said agreement the said onions were warranted and represented by the defendants as having been planted and grown from a seed known as 'Y-50'; that the said onion seed from which the said onions had been planted was not, in fact, 'Y-50' onion seed as represented and warranted by said defendants but was Woodruff 'Early Yellow Globe Hybrid' seed; that the said Woodruff 'Early Yellow Globe Hybrid' seed was not suitable to farming conditions in the area where planted and did not, in fact, produce the same onion as the 'Y-50' as warranted; that the said Woodruff 'Early Yellow Globe Hybrid' seed was, in fact, the wrong variety of seed for planting in the area at the time and that as a result thereof, 48½% of the crop produced went to seed prior to harvest and was unmarketable and was not as warranted by the said defendants; that the plaintiffs notified defendants of said breach of warranty within a reasonable time; that the said onions produced and grown from the said Woodruff 'Early Yellow Globe Hybrid' seed were, in fact, two weeks later in maturing and harvesting than they would have been had they been grown from the 'Y-50' seed as warranted."

Turning to the findings on the cross-complaint, we see that the court acted upon two theories in awarding judgment: (1) warranty; (2) deceit. The court determined "That as a direct and proximate result of the falsity of the said representations and of the breach of the said warranties, the said

cross-complainants were damaged in the sum of $93,523.68 ..." and found that:

". . . after being made aware of the cross-complainants' plans with regard to planting onions and as to the type of onions cross-complainants desired to plant and of the qualities that said onions would necessarily have to possess and the purpose for which said onions were being planted, namely, a type of onion which would mature early, which would not produce excess numbers of seeders, and which would generally have the qualities of that certain onion known in the industry as the 'Y-50,' said cross-defendant, Dick Carey, acting within the course and scope of his employment with cross-defendant F. H. Woodruff & Son, Inc., and pursuant to authorities given to him by the said F. H. Woodruff & Son, Inc., a corporation, his principal, represented and warranted orally that the Woodruff 'Early Yellow Globe Hybrid' onion seed would produce onions of exactly the same quality as the said 'Y-50' onion seed and the said cross-defendant warranted that the said Woodruff 'Early Yellow Globe Hybrid' onion seed would produce onions having the same characteristics as possessed by that certain variety of onion known in the industry as 'Y-50' and that the said Woodruff 'Early Yellow Globe Hybrid' onion seed was fit for the purpose for which the cross-complainants intended to use the same; that in reliance upon the said warranties and each of them of the cross-defendants, Dick Carey and F. H. Woodruff & Son, Inc., a corporation, the cross-complainants purchased and planted the aforesaid Woodruff 'Early Yellow Globe Hybrid' onion seed; that no limitation with respect to liability and warranty was ever communicated to the said cross-complainants."

Thus, the warranties on the complaint and the cross-complaint were entirely separate and unconnected. The record shows clearly that Gnesa did not tell Shoemake before the latter talked with Covert what warranty or representation was made by Carey on behalf of his principal. Shoemake testified in part as follows:

"Q. Did you discuss the matter of what seed Mr. Gnesa had purchased after it was purchased? From Dompe Supply Company for this given year? A. Did I discuss it with Mr. Gnesa?

"Q. Yes. A. No.

"Q. You assumed, did you not, inasmuch as you had bought Y50 before that this was Asgrow Y50? A. Well, I assumed it was Y50.

"

"Mr. Jones: Q. Mr. Shoemake, referring now to 1956, again, who actually made the decision that Woodruff Hybrid Early Yellow Globe seed should be planted by your partnership? A. Mr. Gnesa.

"Q. And you played no part in that decision—— A. (Interrupting) No."

As is said in subdivision 6 of section 1789 of the Civil Code: "The measure of damages for breach of warranty is the loss directly and naturally resulting in the ordinary course of events from the breach of warranty." ██ Obviously, if Shoemake had no knowledge of the representations made by Carey to Gnesa, the loss arising from the warranty made by Shoemake to Covert could not possibly result directly or naturally in the ordinary course of events from the representations made by Carey. While the subject matter of the two warranties or representations is much the same, there is no causal connection between the two.

██ Furthermore, even if there had been some connection between the two sets of warranties or representations, the damages of $66,182.68 awarded plaintiffs are obviously excessive. As already noted, this total is based in part upon the sums which plaintiffs laid out to secure their interest in the crop, and this element is an entirely false quantity. The essential basis for recovery by plaintiffs against defendants was the excess over the actual net crop proceeds of what the net proceeds would have been if the seed had been as warranted. Unfortunately for them, the defendants have not appealed from the judgment awarded plaintiffs. But there is no reason why cross-defendants should be bound by it.

One of the principal questions to be determined is whether the cross-defendants are liable to the cross-complainants on a warranty or merely on the basis of deceit because of representations which were technically fraudulent (Civ. Code, § 1572, subd. 2; Civ. Code, § 1710, subd. 2.) The chief differentiation in the result would relate to damages. ██ If recovery is on a breach of warranty, the damages would be the difference in reasonable market value between the crop as actually produced, less necessary expenses for its production and sale, and the theoretical crop that would have been produced if the warranty had been complied with, less the necessary expenses for raising and selling the crop. (43 Cal.Jur.2d, Sales, § 289, p. 411.) ██ If recovery is based on false representations or deceit only, the measure of damages would be the cross-complainants' out-of-pocket loss. (*Bagdasarian* v.

*Gragnon*, 31 Cal.2d 744 [192 P.2d 935]; *Gagne* v. *Bertran*, 43 Cal.2d 481 [275 P.2d 15]; *Clar* v. *Board of Trade*, 164 Cal.App.2d 636 [331 P.2d 89].)

As already noted, the cross-complaint is based on each of the two theories, pleaded separately; the findings of fact and conclusions of law support both the allegations of fraudulent representations and warranty. Damages can only be given on one theory or the other—not on both.

In Prosser on Torts (2d ed. 1955), pages 522 et seq., the historical development of the tort action of deceit and the contract action of breach of warranty is concisely and clearly reviewed. Prosser on pages 523 to 524 continues: "The divorce of warranty from deceit was completed by about the beginning of the nineteenth century. By that time warranty had become identified with the existence of a contract between the parties. Although the original tort form of the action still survives as a possible procedural alternative, and the tort theory may have important consequences, there are only a limited number of cases, and those almost entirely concerned with the liability of a seller of food to the ultimate consumer, in which a warranty has been found without a contract. Deceit, on the other hand, is essentially a tort action, and does not require the existence of any contract, although of course the tort itself may often coincide with one. Furthermore, because of its contract character, warranty has become a matter of strict liability, without any wrongful intent or negligence on the part of the defendant, while deceit, as it developed in the law of England, is to be classified as an intentional tort, requiring knowledge or belief of falsity or conscious ignorance of the truth, and hence something of an intent to mislead. In the American courts, this distinction is not always clearly drawn, and it has been obscured or abandoned in many jurisdictions by decisions which in effect have taken over the strict liability of warranty and adopted it in the deceit form of action."

Section 1732 of the Civil Code defines an express warranty as follows: "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. . . ."

The following discussion is contained in 43 California Jurisprudence 2d, Sales, section 107, page 242: "The modern tendency is to construe liberally in favor of the buyer lan-

guage used by the seller in making affirmations respecting the quality of his goods, and to enlarge the responsibility of the seller by construing his every affirmation to be a warranty if such a construction is reasonable. Thus, any representation of special quality, made by the seller to induce a sale and on which the buyer relies, is a warranty, especially where inspection by the buyer is not possible and the seller knows the quality of the goods and the buyer does not.'' (See also Burr v. Sherwin Williams Co., 42 Cal.2d 682, 696 [268 P.2d 1041]; Lane v. C. A. Swanson & Sons, 130 Cal.App.2d 210, 214 [278 P.2d 723]; Roberts Distrib. Co. v. Kaye-Halbert Corp., 126 Cal.App.2d 664, 668 [272 P.2d 886]; Cole v. Weber, 69 Cal.App. 394, 397 [231 P. 353]; 46 Am.Jur., Sales, § 313, p. 494.)

 The positive affirmations and representations made by Woodruff through its agent Carey with respect to the seed constituted an express warranty upon which recovery may be had if the requirement of privity as between the parties is satisfied. While the written order in the transaction was signed by Dompe, the essential negotiations for the sale of the seed and with regard to the quality and characteristics of the subject matter of the contract were directly between Mr. Carey, as the authorized representative of the Woodruff Company, and Mr. Gnesa, one of the partners. A just sense of reality requires a determination that it was Carey's unfounded assurances that effectuated and constituted the sale. The cross-complainants allege and the court found that the sale was made by Woodruff to the cross-complainants.

In recent years the extension of the rule of liability, particularly as to implied warranties in the entire absence of privity, has been one of the notable features of the enlargement and adjustment of our law to meet the needs of business and human relationships under modern conditions. The foreseeability of harm, the degree of certainty that a plaintiff suffered injury, the closeness of the connection between a defendant's conduct and the injury suffered, the moral blame attached to defendant's conduct and prevention of future harm have become the general tests of liability, rather than a strict adherence to a theory of privity. (Biakanja v. Irving, 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358]; Peterson v. Lamb Rubber Co., 54 Cal.2d 339 [5 Cal.Rptr. 863, 353 P.2d 575]; Dow v. Holly Mfg. Co., 49 Cal.2d 720 [321 P.2d 736]; Gottsdanker v. Cutter Laboratories, 182 Cal.App.2d 602 [6 Cal.Rptr. 320]; Klein v. Duchess Sandwich Co., Ltd., 14

Cal.2d 272 [93 P.2d 799]; *Vaccarezza* v. *Sanguinetti*, 71 Cal. App.2d 687 [163 P.2d 470]; *Kalash* v. *Los Angeles Ladder Co.*, 1 Cal.2d 229 [34 P.2d 481]; *MacPherson* v. *Buick Motor Co.*, 217 N.Y. 382 [111 N.E. 1050]; *Henningsen* v. *Bloomfield Motors, Inc.*, 32 N.J. 358 [161 A.2d 69]; *Baxter* v. *Ford Motor Co.*, 168 Wash. 456 [12 P.2d 409, 88 A.L.R. 521].)

Here we have an express warranty made by the cross-defendant company to the cross-complainant partnership, relied on by the latter; as indicated in *Burr* v. *Sherwin Williams Co.*, supra, 42 Cal.2d 682, 697, if there was privity between the parties, recovery may be had on a contract theory.

In the case of *Southern Cal. Enterprises* v. *Walter & Co.*, 78 Cal.App.2d 750, 752 [178 P.2d 785], it was alleged that the respondent carpet manufacturer had agreed with the buyer that if it would purchase the carpet required for its place of business from one Freeman, who in turn would buy it from respondent, such carpet would ". . . by reason of its quality and the manner in which it would be assembled and installed, last for a period of six to eight years following its installation; . . ." In discussing the question of the defendant's liability on the warranty, the court says at page 760:

"The warranty induced appellant to purchase carpet fabricated by respondent, thus contributing to the latter's immediate benefit and profit. It was a valid contract based on a good and sufficient consideration. (*Woods Lumber Co.* v. *Moore*, 183 Cal. 497, 504 [191 P. 905, 11 A.L.R. 549].) A contract is supported by an adequate consideration if there is some benefit to the promisor or detriment to the promisee. (*Booth* v. *Bond*, 56 Cal.App.2d 153, 157 [132 P.2d 520]; *Brownfield* v. *McFadden*, 21 Cal.App.2d 208, 214 [68 P.2d 993].) Respondent relies on sections 1731, 1732 and 1735 of the Civil Code relating to warranties by a seller to a buyer. There is no implication in those sections that an express warranty by a manufacturer of merchandise to a user on condition that he purchase the manufacturer's goods from an intermediate party is not valid."

The court held that there could be recovery against the manufacturer on the theory that there was an express warranty and a direct contract between the parties.

In *Free* v. *Sluss*, 87 Cal.App.2d Supp. 933, 936 [197 P.2d 854], the court held that there could be recovery by a purchaser directly against the manufacturer of granulated soap by reason of the express warranty or guarantee of quality printed on the box containing the soap. The court argues

that the printed warranty ". . . reached beyond the dealers to persons in the position of plaintiffs. It establishes the manufacturer's knowledge and intention that the goods should move through the usual channels of trade, and was a representation addressed to those who would deal in its product. It was under no obligation to make the guarantee, but having made it, it does not lie in its mouth to repudiate it when the condition of complete unsuitability for the market brings the guarantee into play.

" . . . . . . . . . . . .

"That the manufacturer had a financial interest in the immediate sale to plaintiffs is established. [Citing authority.] The evidence is uncontradicted that it marketed a product which it had manufactured without the necessary ingredients to produce merchantable soap."

In *United States Pipe & Foundry Co.* v. *City of Waco*, 130 Tex. 126 [108 S.W.2d 432], the court held that the City of Waco had the right to recover a judgment directly against the manufacturer of pipe on the theory of an express warranty made by agents of the pipe company to the purchaser, even though the purchase was made through a local dealer. In the opinion it is said at page 434 [of 108 S.W.2d] :

"Obviously, a court may look through the form to the substance of such a situation, and proceed to judgment, not upon what it seems to be, but upon what in truth it is. Here the manufacturer, in order to secure to itself the benefits of a large sale of its pipe, induced the city by representations as to its fitness and quality, to specify same. By indirection it thus secured for itself a sale as certainly, and presumably as profitably, as if a direct contract of sale had been made with the city. Having secured the benefits, it may not now avoid the burdens of the transaction. It did not need to speak, but having done so and secured a sale of its product, the law required it to speak the truth. In form, there was one voice and another's hand that signed; in truth, 'the voice was the voice of Jacob, but the hand was that of Esau.' "

*Spartanburg Hotel Corp.* v. *Alexander Smith, Inc.*, 231 S.C. 1 [97 S.E.2d 199], involved the sale of carpeting to a hotel. The action was for breach of an express oral warranty, and the court held that recovery would be justified, even though a local dealer, Hammond-Brown-Jennings Company, billed the hotel for the purchase price of the carpeting, and payment was made to the local dealer. In the opinion it is said at page 202 [of 97 S.E.2d] :

"There is evidence in the record from which the jury could have concluded that the appellant contracted directly with the respondent for the sale of the carpeting in question, and that the method of billing the respondent for the purchase price through the Hammond-Brown-Jennings Co. was a part and parcel of the contract and made for the benefit of the appellant."

*General Motors Corp.* v. *Dodson* (Tenn.App.) 338 S.W.2d 655, 661, involved the sale of a new Oldsmobile automobile to the plaintiffs, R. P. Dodson and wife, by the Kemp Motor Company. The brakes of the automobile were defective from the beginning. While the car was in use the brakes locked, the automobile plunged into a ditch, and Mrs. Dodson was severely injured. Judgment was entered against the General Motors Corporation on the basis of its printed warranty. The Tennessee court observed, ". . . the jury could have found that General Motors was the actual person or entity with whom plaintiffs were dealing, and Kemp was a conduit or subterfuge by which General Motors tried to exempt itself from liability to the consumers who are the plaintiffs."

In *Studebaker Corp.* v. *Nail*, 82 Ga.App. 779 [62 S.E.2d 198], the court held that the manufacturer of the Studebaker automobile could be held liable for a breach of the warranty contained in the "Dealer Service Policy for Studebaker Owners," delivered to the buyer by the local dealer. In discussing the legal situation involved the court said at page 201-202 [of 62 S.E.2d] :

"From the contents of the instrument and the circumstances surrounding its issuance to plaintiff, it is shown that the 'Standard Factory Warranty' set out on the back side of the instrument was intended by the defendant to be a direct warranty by it to the plaintiff purchaser. It is true that a warranty of personalty does not run with the article warranted. But a manufacturer may warrant his products to ultimate purchasers. In this day of progressive and highly competitive business, a warranty of his product by a manufacturer to the ultimate purchaser of his product may be intended by the manufacturer as an added inducement to the ultimate purchaser to buy the product of that manufacturer rather than that of his competitor. The consideration for such a warranty would be the purchase by the ultimate purchaser of that manufacturer's product, which is in effect a direct purchase as it would have been if the purchaser had bought from an agent of the manufacturer instead of an independent

dealer or contractor. There are many products sold today where the manufacturer warrants to the ultimate purchaser the virtues of his product and intends to bind himself by such warranties. See: 'Business Practice Regarding Warranties in the Sale of Goods' by Bogert and Fink, 25 Ill.L.Rev. 400. Certainly it would be a great injustice to the buying public not to hold enforceable a warranty made by a manufacturer and relied upon by the purchasers. It is the ultimate purchaser that makes the manufacture of the product possible, the purchase by intermediate distributors and dealers being merely a means of distribution to the ultimate purchaser. This decision deals only with express warranties where a manufacturer expressly and directly warrants his products to the ultimate purchaser. We recognize the principle that implied warranties of law are imposed only as between parties in privity of contract but they are rules of law which the law imposes on contracting parties. Generally the law does not bridge the gap between the manufacturer and ultimate purchasers by implying warranties, but it throws up no barrier preventing a manufacturer from itself bridging the gap. There is no obstacle preventing a manufacturer from making a contract with an ultimate consumer to guarantee an article sold to the latter, directly or indirectly, if the elements of intention to contract and consideration are present, as they are in this case.''

We hold that the trial court had ample justification and authority under the law and the evidence to hold, as it did, that the cross-defendant Woodruff is liable to the cross-complainants on an express warranty and that the requirements of privity were satisfied.

It is claimed by the appellants that liability on the warranty was effectively limited by the provision of the printed sales order signed by Woodruff and Dompe. ▮▮▮ However, there was no showing that this attempted restriction was ever called to the attention of the purchasers of the seed, and ''. . . it is universally held that an attempt to disclaim the binding effect of [anterior warranties] . . . upon or after delivery of the goods, by means of language on an invoice, receipt or similar notice, is ineffectual unless the buyer assents or he is charged with knowledge of nonwarranty as to the transactions. [Citing cases.]'' (*India Paint & Lacquer Co.* v. *United Steel Prod. Corp.*, 123 Cal.App.2d 597, 608 [267 P.2d 408].) There is no such evidence in the record.

As already pointed out, the routine inclusion in the judgment on the cross-complaint of the amount of damages awarded to plaintiffs on the complaint was improper. The correct method of determining damages as between the cross-complainants and cross-defendants has not been followed, and the case must therefore be sent back for retrial as against Woodruff on the question of damages only.

The proper measure of damages is the difference between the reasonable market value of the crop as actually raised and sold and the reasonable market value of the crop which would have been produced and sold if the warranty had been complied with, necessarily deducting in each instance from the gross market value of the product the cost of planting, irrigation and care of the crop and the cost of harvest, transportation and sale. (*Paul* v. *Williams,* 64 Cal. App.2d 696, 703 [149 P.2d 284]; *Newhall Land & Farming Co.* v. *Hogue-Kellogg Co.,* 56 Cal.App. 90, 95 [204 P. 562]; 43 Cal.Jur.2d, Sales, § 289, p. 411; 46 Am.Jur., Sales, § 750, pp. 877-879.) Obviously, net profit cannot be ascertained without deducting the cost of producing a crop. The fact that in the total transaction the cross-complainants received from plaintiffs a payment on the purchase of the field of growing onions in reduction of damages need not be considered, as the record shows that defendants and cross-complainants have a final judgment against them in favor of plaintiffs for all the monies so paid together with plaintiffs' lost profits.

Complaint is made by appellants that the market for onions, as shown by the evidence, varied greatly from time to time, that the sale dates adopted by the court for the calculation of damages were uncertain, and that the figure assumed for market value of the theoretical portion of the potential crop was at an unduly high point on the scale. The mere fact that it is difficult to ascertain exact damages is no reason to eliminate them completely. (*Noble* v. *Tweedy,* 90 Cal.App.2d 738, 745 [203 P.2d 778]; *Phalanx Air Freight, Inc.* v. *Nat. etc. Freight Corp.,* 104 Cal.App.2d 771, 776 [232 P.2d 510]; *Smith* v. *Mendonsa,* 108 Cal.App.2d 540, 543 [238 P.2d 1039]; 14 Cal.Jur.2d, Damages, §§ 65-66, pp. 690-692.) However, the wisdom of the old saw, "There's many a slip 'twixt cup and lip" is particularly applicable to farming operations. There are so many elements that may effect a complete reversal of expected profits, including weather, farming practices, irrigation timing, the nature of the harvest and transportation systems employed and the condition of the

market, that care should be taken by a trial court not to be overoptimistic as to the reasonable market value of a theoretical crop. These are considerations to be given due weight upon retrial of the case.

As the recovery on the cross-complaint is based upon contract, and Dick Carey was the known agent of his disclosed principal, the judgment against him personally is unjustified. (*Oppenheimer* v. *General Cable Corp.*, 143 Cal. App.2d 293, 297 [300 P.2d 151]; *LaRosa* v. *Glaze*, 18 Cal. App.2d 354, 357 [63 P.2d 1181]; *Marks* v. *Jos. H. Rucker & Co.*, 53 Cal.App. 568 [200 P. 655]; *Carlesimo* v. *Schwebel*, 87 Cal.App.2d 482, 487 [197 P.2d 167].)

The judgment against the cross-defendant, Dick Carey, is reversed; the judgment against the cross-defendant, F. H. Woodruff & Son, Inc., a corporation, is affirmed, except as to damages, and the cause is remanded for retrial on the cross-complaint as to damages only.

Stone, J., concurred.

Brown, J., deeming himself disqualified, did not participate.